UNITED STATES of America,
Plaintiff,

v.

**K. Glenn SHAW, Eileen B. Aird, and Louise Verde, Defendants.**

**No. Crim.A. 99–10044–RE.**

United States District Court,
D. Massachusetts.

June 19, 2000.

---

Nancy Silverman, Martha Purcell Rogers, Ober Kaler, Washington, DC, for Eileen B. Aird.

Douglas Farquhar, Hyman, Phelps & McNamara, Washington, DC, Maria R. Durant, David M. Osburne, William H. Kettlewell, Dwyer & Collora, Boston, MA, for Glenn K. Shaw.

Sollers J. Sedwick, III, Michael E. Meece, King & Spalding, Washington, DC, for Louise Verde.

Susan G. Winkler, Diane C. Freniere, Susan C. Hanson–Philbrick, U.S. Atty's Office, Boston, MA, for U.S.

### 0pinion

KEETON, District Judge.

### I. Pending Motions

Pending for disposition at this time are the following motions:

(1) Defendant K. Glenn Shaw's Motion to Dismiss Count 18 of Superseding Indictment for Failure to State a Crime (Docket Nos. 39, filed September 15, 1999, and 101, filed February 11, 2000) with Supporting Memoranda (Docket Nos. 41, filed September 15, 1999, and 102, filed February 11, 2000) and Appendix (Docket No. 103, filed February 11, 2000). The Government has filed a Response (Docket No. 128, filed March 15, 2000). Defendant K. Glenn Shaw filed a Reply (Docket No. 133, filed April 4, 2000). The Government filed a Surreply (Docket No. 161, filed June 5, 2000);

(2) Defendant K. Glenn Shaw's Motion to Dismiss on Statute of Limitations Grounds (Docket Nos. 43, filed September

15, 1999, and 104, filed February 11, 2000) with Memorandum in Support (Docket No. 105, filed February 11, 2000). The Government has filed an Opposition (Docket No. 112, filed February 25, 2000).

## II. Procedural Background

The procedural background is relevant to the pending motions that are the subject of this Opinion.

On February 10, 1999, in a one-count indictment, a grand jury charged Dr. K. Glenn Shaw (Shaw) with a conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371. The grand jury charged, specifically, that Shaw conspired to violate the anti-kickback statute, to wit, "to induce external clinics to order and to arrange for ordering laboratory blood testing services including Non-Routine Tests for their dialysis patients from Lifechem, which services were paid for primarily by Medicare Trust Funds." Docket No. 1, ¶ 14.

Shaw entered a plea of not guilty on February 23, 1999 before Magistrate Judge Cohen.

On September 15, 1999, Shaw moved to dismiss the indictment for failure to state a crime and on statute-of-limitation grounds. *See* Docket Nos. 39 and 43.

On September 22, 1999, the grand jury returned a multi-count superseding indictment as to defendants Eileen B. Aird (Aird) and Louise Verde (Verde) and Shaw. Count One alleges that Aird and Verde conspired to defraud the government, a violation of 18 U.S.C. § 371. Count One states, specifically, that the purpose of the conspiracy was, among other things,

to evade and frustrate efforts by Medicare to pay only for the reasonable and medically necessary blood testing of Medicare Program beneficiaries as ordered by physicians in the normal ordinary course of the treatment of their dialysis patients; and thereby to fraudulently obtain unlawful reimbursement from the Medicare Program for thousands of medically unnecessary, and therefore not lawfully reimbursable, laboratory tests performed by LIFE-CHEM on blood drawn from dialysis patients.

Docket No. 46, ¶ 31. Counts Two through Seventeen allege that, in conspiring to defraud the United States, as stated in paragraph one of the superseding indictment, Aird and Verde also violated 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 2 (aiding and abetting). *See id.* at ¶¶ 39–68.

Count Eighteen of the superseding indictment re-alleges a violation of 18 U.S.C. § 371, stating that defendant Shaw

knowingly, willfully, and intentionally combined, conspired, confederated and agreed to commit an offense against the United States and its agency the Health Care Financing Administration, namely, to knowingly, willfully and intentionally offer and pay remuneration, directly and indirectly, overtly and covertly, in cash and in kind, to wit: by rebates and special pricing on dialysis related products, by lavish entertainment and hunting trips, by consultant fees, by grants, and by writing off debt for laboratory services for indigent and HMO patients, all such remuneration being made to induce the external dialysis facilities to order and arrange for the ordering from LIFECHEM of any service and item paid for, in whole or in part, by the Medicare Program, specifically clinical laboratory blood testing conducted for dialysis patients in the external facilities, all in violation of Title 42, United States Code, Section 1320a–7b(b)(2)(B).

Docket No. 46 at ¶ 70.

Shaw entered a plea of not-guilty before Magistrate Judge Cohen on Count Eighteen of the superseding indictment on October 15, 1999. On the same day, both Aird and Verde entered pleas of not-guilty on Counts One through Seventeen.

On February 11, 2000, Shaw moved to dismiss Count Eighteen of the superseding indictment (the only count against him) for

failure to state a crime. On the same day, Shaw also moved to dismiss Count Eighteen on statute-of-limitation grounds.

On February 22, 2000, the Government dismissed Counts Two through Nine of the superseding indictment against Aird and Verde.

On February 25, 2000, the Government filed its response to Shaw's motion to dismiss Count Eighteen of the indictment on statute-of-limitation grounds. *See* Docket No. 112.

On March 15, 2000, the Government filed its response to Shaw's motion to dismiss Count Eighteen of the indictment for failure to state a crime. *See* Docket No. 128. On April 4, 2000, Defendant K. Glenn Shaw filed a Reply. *See* Docket No. 133. On June 5, 2000, the Government filed a Surreply. *See* Docket No. 161.

On April 25, Magistrate Judge Cohen issued his final Status Report ordering the case returned to "the district judge to whom this case is assigned for further proceedings." Docket No. 150.

On May 25, 2000, all of the parties appeared before me for an initial pre-trial conference. At that conference, the defendants filed a list of the pending motions that remain to be resolved by the court. *See* Docket 160. Among them are Shaw's two motions to dismiss that are the subject of this Opinion.

### III. Factual Background

The following recitation of relevant facts is from the superseding indictment (*see* Docket No. 46) unless otherwise stated.

#### A. The Players

National Medical Care (NMC), a health care company, provided through its various subsidiaries, an array of products and services to patients diagnosed with end-state renal disease ("ESRD"). From in or about 1989 through in or about December 3, 1993, Dr. K. Glenn Shaw was President of NMC Medical Products, Inc. (MPD), a wholly owned subsidiary of National Medical Care, Inc. (NMC), that manufactured, sold, and distributed products used in kidney dialysis, a primary treatment of ESRD. MPD sold these dialysis related products both to the NMC-owned clinics, called Bio–Medical Applications (BMAs) and and to dialysis facilities not owned by NMC.

NMC also had another division, called the LifeChem division (LifeChem), that provided clinical laboratory blood testing services both to the BMAs and to dialysis clinics not owned by NMC. LifeChem also specialized in performing laboratory blood tests for ESRD patients.

From August 1990 through January 1993, Eileen Aird was the General Manager of LifeChem. From January 1993 until October 1996, Aird was the president of LifeChem.

Louise Verde was the Product Manager for LifeChem from 1987 until late 1993. From late 1993 until October 1997, Verde was Senior Product Manager in Marketing at LifeChem.

On October 1, 1996, Fresneius Medical Care A.G., a German corporation, purchased NMC, and the entity formerly known as NMC continued doing business in North America under the name Fresneius Medical Care—North America.

Shaw retired from NMC's employ in 1993.

#### B. The Program

In 1965, Congress enacted Title XVIII of the Social Security Act ("The Medicare Program") authorizing the federal government to pay for the cost of certain medical services, including clinical laboratory blood testing services, for persons aged 65 and older. By amendment in 1972, Congress extended the coverage of the Medicare Program to include paying, under most conditions, for the cost of certain medical services for persons suffering from ESRD, regardless of the person's age.

The Department of Health and Human Services (HHS) administers the Medicare

Program through the Health Care Financing Administration (HCFA). In discharging its duties, HCFA makes contracts with private insurance companies ("carriers") to receive, review, and pay lawful claims for reimbursement for the provision of clinical laboratory services to Medicare Program beneficiaries.

HCFA mandates that all ESRD patients undergo, in addition to dialysis, monthly blood testing in order to monitor the efficiency of the dialysis treatment. These tests are performed by clinical laboratories, like LifeChem, and classified by Medicare as "routine tests." The Medicare Program reimburses dialysis clinics directly for dialysis treatments and for routine tests through a monthly fixed payment per patient, per treatment. Because LifeChem was an approved provider under the Social Security Act, LifeChem was authorized to submit directly to the carriers under contract with HCFA lawful claims for reimbursement for these routine tests as well as other tests that were ordered by physicians and that were reasonable and medically necessary in the diagnosis and treatment of Medicare treatment beneficiaries.

For ESRD patients who received dialysis treatments at a dialysis unit or center, Medicare paid for the dialysis that the patient needed for the entire month through a monthly, capitated payment with money from the Medicare Program Trust Funds. That monthly payment was known as the "composite rate payment" and was usually a fixed amount that included reimbursement for the cost of dialysis as well as the cost of the routine tests. The composite rate payment for dialysis did not include payment for any non-routine test (any additional laboratory test required to diagnose or treat non-ESRD medical problems, except those that were labeled "Medicare allowable tests" by HCFA). The medicare program separately paid for non-routine tests by directly reimbursing the clinical laboratory on a fee-for-service basis. To obtain reimbursement for non-routine tests, other than Medicare allowable tests, a clinical laboratory like LifeChem would have to certify to HCFA, through the carrier, that the tests were medically necessary.

## IV. The Problem

The indictment charges that Shaw, as president of MPD, conspired to pay remuneration to independent dialysis clinics for the purpose of inducing those clinics to use LifeChem's laboratory services for, among other things, non-routine tests and medically unnecessary tests that were in whole or in part reimbursable under the Medicare Program, all in violation of the health care anti-kick back statute, 42 U.S.C. § 1320a–7b(b)(2)(B).

Specifically, the Government alleges that the inducements for referring orders for LifeChem's services took the form of rebates and special pricing, grants, entertainment and hunting trips, and write-offs of bad debt for blood laboratory tests of indigent and HMO patients. With regard to the rebates and special pricing—seventy of the alleged illegal instances of remuneration—the Government alleges that beginning in 1987, Shaw, as well as other CEOs at MPD, directed employees to discontinue the practice of expressly stating that pricing or rebates on MPD's dialysis related products was contingent upon receipt by LifeChem of referrals for laboratory blood testing services, while at the same time instructing the same employees to continue to provide rebates or special pricing on MPD products in exchange for receiving referrals from the dialysis facilities to LifeChem for the laboratory blood testing. The seventy instances of alleged illegal remunerations are, defendant contends, legal "price reductions" in the form of credits applied to past due balances and future purchases of medical products purchased by the independent dialysis clinics. *See* Docket No. 102 at 5. They are listed in the superseding indictment at paragraph 73(g).

The other eight instances of alleged illegal remuneration are in the form of edu-

cational or research grants, debt write-offs, consulting fees and entertainment. As an example, the Government alleges that in the early 1990s, Shaw approved payments by MPD for lavish holiday entertainment parties, including a yacht rental worth thousands of dollars, for an external dialysis facility, in exchange for referrals of that facility's laboratory business to LifeChem. For the purpose of advancing his Motion to Dismiss for Failure to State a Crime, Shaw does not challenge these eight instances of alleged illegal remuneration (these do not include the seventy similar instances of what the defendant contends are legal "price reductions"). Shaw concedes that even if the court rules that the seventy similar instances of remuneration are not, as a matter of law, illegal under the anti-kickback statute, the trial will nevertheless go forward on the other eight instances. In that circumstance, however, the trial will be significantly abbreviated and considerably less factually complex.

## V. Motion to Dismiss for Failure to State a Crime

### A. Introduction

Shaw has been indicted for conspiring, under 18 U.S.C. § 371, to commit the offense of violating what has been called the Medicare Anti–Kickback Statute (hereinafter "the anti-kickback statute"). That statute reads, in relevant part,

(b) Illegal remunerations

(1) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a–7b(b) (1999).

The section of the anti-kickback statute that follows the above quoted paragraphs carves out various exceptions to the activities that would otherwise be considered illegal under the statute. The exceptions are listed below.

(3) Paragraphs (1) and (2) shall not apply to—

(A) a discount or other reduction in price obtained by a provider of services or other entity under a Federal health care program if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity under a Federal health care program;

(B) any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services;

(C) any amount paid by a vendor of goods or services to a person authorized to act as a purchasing agent for a group of individuals or entities who are furnishing services reimbursed under a Federal health care program if—

(i) the person has a written contract, with each such individual or entity, which specifies the amount to be paid the person, which amount may be a fixed amount or a fixed percentage of the value of the purchases made by each such individual or entity under the contract, and

(ii) in the case of an entity that is a provider of services (as defined in section 1395x(u) of this title), the person

discloses (in such form and manner as the Secretary requires) to the entity and, upon request, to the Secretary the amount received from each such vendor with respect to purchases made by or on behalf of the entity;

(D) a waiver of any coinsurance under part B of subchapter XVIII of this chapter by a Federally qualified health care center with respect to an individual who qualifies for subsidized services under a provision of the Public Health Service Act [42 U.S.C.A. § 201 et seq.];

(E) any payment practice specified by the Secretary in regulations promulgated pursuant to section 14(a) of the Medicare and Medicaid Patient and Program Protection Act of 1987; and

(F) any remuneration between an organization and an individual or entity providing items or services, or a combination thereof, pursuant to a written agreement between the organization and the individual or entity if the organization is an eligible organization under section 1395mm of this title or if the written agreement, through a risk-sharing arrangement, places the individual or entity at substantial financial risk for the cost or utilization of the items or services, or a combination thereof, which the individual or entity is obligated to provide.

42 U.S.C. § 1320a–7b(b)(3).

At issue for Shaw's Motion to Dismiss for Failure to State a Crime is the interpretation and application of what is commonly referred to as the "discount exception," listed in the statute and above as (3)(A).

## B. The Parties' Arguments

Defendant contends that seventy remunerations described in the indictment are, as a matter of law, covered by the "discount exception" and are thus not illegal remuneration under the statute. Shaw reaches this conclusion in the following manner.

*First.* Shaw contends that the government does not dispute that MPD made clear in writing to its buyer-providers of health care goods and services (hereinafter "buyer-providers") how much of a price reduction was being offered and on what basis in order that they could, as is required by law, pass on those reductions to the Medicare program. In other words, Shaw contends that MPD attempted in good faith to comply with the statutory requirements by enabling the buyer-provider to report to Medicare the reductions in prices it was receiving on the goods and services purchased. *Second.* Shaw contends that MPD's communication to its buyer-providers regarding the price reductions constitutes "adequate disclosure" under the "discount exception" and that it is for the buyer-provider to "appropriately reflect" those reductions in the costs claimed to the Federal health care program. *Third.* Shaw asserts that the price reductions at issue fit within the "discount exception" in that they are a form of "discount or other reduction in price" as provided by the words of the exception and are not a "rebate" as in the prohibited "remuneration (including a kickback, bribe, or rebate)".

The government responds in the following manner. *First.* The government says that the "discount exception" is an affirmative defense that must be raised and proved at trial and is therefore not an essential element of the crime the facts of which need to be alleged in the indictment. Specifically, the government says that it is for the jury to decide, based on the court's interpretation of the statute, (1) whether transactions are rebates or discounts and therefore whether they are properly the subject of the "discount exception" and (2) if they are discounts, whether they were "properly disclosed and appropriately reflected," thereby meeting the requirements of the "discount exception." In this regard, the government argues that if the court determines that the transactions were discounts that fall within the "dis-

count exception," the court should still construe the statute to require that for discounts to be "properly disclosed," the material terms of the discounts must appear on the face of the transaction between MPD and the providers. *Second.* The government also says that defendant misreads the statute as a matter of law. The transactions at issue are "rebates," as that word has been defined by the statute, by the promulgating regulations, and by the case law. As rebates, the government contends, they cannot fit within the "discount exception" at all.

Although the issues presented are well-briefed, each party fails to persuade me that the proposed analysis of the issues at stake in this factually and legally complex case is correct. Defendant's Motion to Dismiss for Failure to State a Crime will be denied, but on reasoning somewhat different from that in the government's submissions.

The interpretation and application of the "discount exception" to the Medicare–Medicaid Anti–Kickback Statute appears to be an issue of first impression in this circuit, and perhaps in the circuits across the country. I have found no cases, and counsel have not drawn my attention to any cases, that purport to interpret the "discount exception" to the Medicare–Medicaid Anti–Kickback Statute and, in particular, as bearing on burdens of pleading and burdens of persuasion and production at trial.

I begin with an examination of the history of the statute and the accompanying development of the "discount exception." *See* Part V.C below. The several parts of V.D explain my interpretation of the "discount exception" based on that history and in light of the few cases interpreting and applying the elements of the Medicare–Medicaid Anti–Kickback Statute. *See, e.g.,* *United States v. Bay State Ambulance and Hospital Rental Service,* 874 F.2d 20 (1st. Cir.1989). Part V.D.5 applies that interpretation to the facts of the case

against the defendant Shaw, as alleged in the indictment.

## C. Legislative and Regulatory History of the Anti–Kickback Statute

In 1972, Congress amended the Social Security Act in order to improve those provisions "relating to the old-age, survivors, and disability insurance program, the hospital and medical insurance program, the medical assistance program and the child welfare program." H.R.Rep. No. 92–231, at 1 (1972), *reprinted in* 1972 U.S.C.C.A.N. 4989, 4989–90. The provisions relating to medicare, medicaid and maternal and child health programs, *see id.,* 1972 U.S.C.C.A.N. at 5052, proposed to

provide penalties for certain practices which have long been regarded by professional organizations as unethical, as well as unlawful in some jurisdictions, and which contribute appreciably to the cost of the medicare and medicaid programs. Thus, under the committee bill, the criminal penalty provision would include such practices as the soliciting, offering, or accepting of kickbacks or bribes, including the rebating of a portion of a fee or charge for a patient referral, involving providers of health care services.

*Id.,* 1972 U.S.C.C.A.N. at 5093.

In 1977, Congress strengthened the Social Security Act by adding to it the Medicare–Medicaid Antifraud and Abuse Amendments (a part of which is the anti-kickback statute) the purpose of which was to address the "disturbing degree [of] fraudulent and abusive practices associated with the provision of health services financed by the medicare and medicaid programs." *See* H.R.Rep. No. 95–393, pt. 2, at 44 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3039, 3047. The congressional findings that supported the amendments included findings of

a broad range of improper activities which are not restricted to one particular class of providers or treatment settings. In whatever form it is found . . .

fraud in these health care financing programs adversely impacts on all Americans. It cheats taxpayers who must ultimately bear the financial burden of misuse of funds in any government-sponsored program. It diverts from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services. The wasting of program funds through fraud also further erodes the financial stability of those state and local governments whose budgets are already overextended and who must commit an ever-increasing portion of their financial resources to fulfill the obligations of their medical assistance programs.

*Id.*, 1977 U.S.C.C.A.N. at 3047.

The primary effect of the Medicare–Medicaid Antifraud and Abuse Amendments was to turn those fraudulent acts previously classified as misdemeanors into felonies, increasing penalties to a maximum of a $25,000 fine and up to five years imprisonment. *See id.* at 39, 1977 U.S.C.C.A.N. at 3041.

As originally drafted, the anti-kickback portion of the Medicare–Medicaid Antifraud and Abuse Amendments subjected to the penalty provisions

> any person who solicits or receives any remuneration (1) in return for referring an individual to a person for the furnishing, or arranging for the furnishing of items or services; or (2) in return for purchasing, leasing, or ordering, or arranging for, or recommending the purchasing, leasing, or ordering of goods, facilities, or services. Also, any person who offers or pays any remuneration to any person to induce such person to do similar activities would be subject to the penalty provision.

*Id.* at 53, 1977 U.S.C.C.A.N. at 3056. The bill defined the term "remuneration"

> broadly to encompass kickbacks, bribes or rebates which may be made directly or indirectly, overtly or covertly, in cash or in kind (but would exclude any amount paid by an employer to an employee for employment in the provision of covered items or services).

*Id.* The bill specifically excluded from the prohibited activities, however, "the practice of discounting or other reductions in price ... but only if such discounts are properly disclosed and reflected in the cost for which reimbursement could be claimed." *Id.*

> The committee included this [discount] provision to ensure that the practice of discounting the normal course of business transactions would not be deemed illegal. In fact, the committee would encourage providers to seek discounts as a good business practice which results in savings to medicare and medicaid program costs.

*Id.*

From the inception of these amendments to the Social Security Act, then, a tension existed between what the anti-kickback statute defined as illegal remuneration and the common business practice of offering discounts in order to increase sales. Although the purpose and the reason for the "discount exception" was to keep costs of medical services low and to minimize the burden on the federal health subsidies, the breadth of the statute's prohibition and the ambiguity of the scope of the "discount exception" frustrated the purpose of the statute, making difficult the enforcement and prosecution of fraudulent and abusive practices as well as chilling otherwise innocuous, or even beneficial, commercial arrangements in the health care field. *See* Department of Health and Human Services, Office of Inspector General, Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti–Kickback Provisions, 56 Fed.Reg. 35,952 (1991) (codified at 42 C.F.R. § 1001 et. seq.).

Congress enacted, in 1987, the Medicare and Medicaid Patient and Program Protection Act, Pub.L. No. 100–93, that added two new provisions that addressed the problems of the breadth of the anti-kick-

back statute. One of the provisions, section 14 of Public Law 100–93, required the promulgation of regulations specifying those payment practices that might otherwise be misconstrued as illegal remunerations under the statute but that would from then on be in a category protected from criminal liability under the new paragraph (e) of section 1320a–7b(b), the "illegal remuneration" section, of the statute. *See* 56 Fed.Reg. 35,952 (1991). These regulations have become known as "safe harbors" and have been officially codified into the anti-kickback statute at 42 U.S.C. § 1320a–7b(b)(3)(E) (excluding "any payment practice specified by the Secretary in regulations promulgated pursuant to section 14(a) of the Medicare and Medicaid Patient and Program Protection Act of 1987" from liability under paragraphs (1) and (2) of section 1320a–7b(b)).

Initially, the OIG promulgated only ten safe-harbor provisions under the authority of the 1987 Medicare and Medicaid Patient and Program Protection Act, which were all codified at 42 C.F.R. § 1001.952. Those ten safe-harbor provisions included business arrangements concerning investment interests, space rental, equipment rental, referral services, warranties, employees, group purchasing organizations, the sale of practices, and discounts. *See* 42 C.F.R. § 1001.952 (1991). By granting the Department of Health and Human Services "the authority to protect certain arrangements and payment practices under the anti-kickback statute, [however], Congress intended the regulations to be evolving rules that would be updates periodically to reflect changing business practices and technologies in the health care industry." Department of Health and Human Services, Office of Inspector General, Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti–Kickback Provisions, 64 Fed.Reg. 63,518, 63,518 (1999). In years following the final rule promulgations in 1991, other "safe-harbors" have been added. *See id.*

The regulations implementing the safe-harbor provisions, 42 C.F.R. § 1001.952, set forth in detail the precise form the business arrangements must take in order to be protected under the safe-harbor provisions from the possibility of criminal prosecution under the anti-kickback statute. *See* 42 U.S.C. § 1320a–7b(b)(3)(E); 42 C.F.R. § 1001.952. The OIG was careful to state, however, that the safe harbors do "not expand the scope of activities that the statute prohibits. The statute itself describes the scope of illegal activities. The legality of a particular business arrangement must be determined by comparing the particular facts to the proscriptions of the statute." Department of Health and Human Services, Office of Inspector General, Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti–Kickback Provisions, 56 Fed.Reg. 35,952, 35,954 (1991). *See also* Department of Health and Human Services, Office of Inspector General, Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti–Kickback Provisions, 59 Fed. Reg. 37,202, 37,203 (1994) (clarifying the effect of the safe-harbor provisions by saying that "[w]hether a particular payment practice violates the statute is a question that can only be resolved by an analysis of the elements of the statute as applied to that set of facts. Generally speaking, however, the original final [safe-harbor provisions] did describe payment practices that would be prohibited, where the unlawful intent exists, but for the safe harbor protection that has been granted.").

Defendant Shaw does not invoke the safe-harbor provisions as a reason for why his actions, as described in count eighteen of the indictment, are not prohibited activity under the anti-kickback statute. *See* Docket No. 133 at 8 ("Dr. Shaw's motion to dismiss contends that the price reductions alleged in the Superseding Indictment were protected by the discount provision, not by a regulatory safe harbor.") Shaw invokes the statutory "discount exception" that was written into the original act by the Medicare–Medicaid Antifraud and

Abuse Amendments in 1977, what is now codified at 42 U.S.C. § 1320a–7b(b)(3)(A) (emphasis added). The safe-harbor provisions, now codified at 42 U.S.C. § 1320a–7b(b)(3)(E) (emphasis added), are separate and independent bases for which certain activities may be excluded from criminal liability under the anti-kickback statute. (The fact that the safe-harbor provisions set forth an independent basis for exclusion from criminal liability under the statute does not mean, of course, that a defendant is precluded from raising both the "discount exception" and one of the safe harbors as a defense. In this case, however, Shaw raises only the "discount exception" as a reason for why the indictment fails to state a crime.)

The independent status of the safe-harbor provisions from the "discount exception," however, does not mandate their isolation from each other when one is looking for guidance as to the proper interpretation and application of one of the statutory exceptions to criminal liability. *See, e.g., Jusino Mercado v. Commonwealth of Puerto Rico*, 214 F.3d 34, 40 (1st Cir.2000) (stating that a statute's meaning in particular instances is to be arrived at not only by a consideration of the words themselves, but by considering, as well, the context, the purposes of the law, and the circumstances under which the words were employed). On the contrary, as one of the safe-harbor provisions is a "discount safe-harbor," it is reasonable that a court charged with the task of interpreting and applying the statutory "discount exception" would look to the regulatory agency's implementation of its own "discount safe-harbor" provision as guidance for how a "discount," generally, might provide shelter from the criminal penalties under the anti-kickback statute, a statute that otherwise penalizes "any remuneration" (of which a discount is a subset) that is willfully offered, paid or solicited in order to induce business reimbursable under federal or state health care programs. This does not mean that what the OIG says in its promulgated regulations about discounts is controlling on how the word "discount" is to be interpreted and applied in the statutory "discount exception." It means only that when interpreting the "discount exception," a court is wise to consider those discounting arrangements the regulatory agency, charged with aiding the implementation of and the corporate compliance with the statute, considers non-fraudulent and non-abusive under the safe-harbor provisions promulgated under the authority granted it by congress.

By way of a caveat, however, I note that the scope of the meaning of "discount" under the discount safe harbor has changed considerably since its first official iteration in 1991, especially as "discount" relates to a "rebate." These changes are significant as supporting an inference that reliance on any one definition of "discount" or "rebate" as found in the regulations that implement the safe-harbor provisions (42 C.F.R. § 1001.952(h)) would be error if relied upon for the purposes of interpreting the "discount exception" (§ 1320a–7b(b)(3)(A)) of the anti-kickback statute. The changing nature of protected discounted (and even rebated) arrangements under the safe-harbor regulations is an expression of what the OIG has explained to be congress's intent that the regulations be "evolving rules that would be updated periodically to reflect changing business practices and technologies in the health care industry." 64 Fed.Reg. 63,518, 63,518 (1999). Thus, because the "discount exception" to the anti-kickback statute is a separate provision under which the defendant may claim an exemption from liability under the statute—one that was enacted over a decade before the safe-harbor provisions were first promulgated to provide further protection for health-care-service-and-goods providers from liability under the statute—I will interpret the "discount exception" to the anti-kickback statute in light of those discounting arrangements that the safe-harbor provisions have explicitly deemed protected from criminal liability, but I will not be limited by the

definitions imposed by the safe-harbor provisions. *See, e.g.,* 42 C.F.R. § 1001.952(h)(4) (for a definition of "rebate" for the purposes of the paragraph in which the word is found); 42 C.F.R. § 1001.952(h)(5) (for a definition of "discount" for the purposes of the paragraphs in which the word is found).

## D. Interpretation of the "Discount Exception"

### 1. *Carve–Out Structure of Statutory Drafting*

As a preliminary matter, I note that the "discount exception" is an example of the "common technique of modern legal drafting referred to in various phrases of which 'carve-out' is an example." *See Keeton, Judging in the American Legal System* (Lexis Law Publishing, 1999) § 14.5.3 (and citations therein). In paragraphs (1) and (2) of § 1320a–7b(b), the statute sets forth the activities that it makes illegal ("whoever knowingly and willfully solicits or receives any remuneration . . ."), and then in its paragraph (3), the statute partially withdraws from that declaration, or "carves-out" an exception to that declaration by granting certain "discounts or other reductions in price" that define a kind of immunity from criminal liability under the statute ("Paragraphs (1) and (2) shall not apply to—(A) a discount or other reduction in price . . ."). *See* 42 U.S.C. § 1320a–7b(b)(3).

This understanding of the "discount exception"—that but for the "carve-out" provision, a discount or other reduction in price would fall within the activities prohibited by paragraphs (1) or (2) of section 1320a–7b(b)—is reflected in the OIG's Final Rule promulgations. For example, in 1991, as part of its analysis of the scope of the statute, the OIG explained its understanding that a discount could be an "illegal remuneration" under the statute (as it is often made for the purpose of inducing referrals and further purchases) unless it otherwise satisfies the exception's reporting requirements. *See* 56 Fed.Reg. 35,952,

35,957 (1991) ("Congress's intent in placing the term 'remuneration' in the statute in 1977 was to cover the transferring of anything of value in any form or manner whatsoever. . . . Moreover, the statutory exception for discounts demonstrates that Congress prohibited transactions where there is no direct payment at all from the party receiving the referrals. The remuneration in a discount is merely a lowered price that a purchaser would otherwise obtain from a seller, which is made as an inducement to purchase larger quantities.").

Thus, the "discount exception" carves out a specific kind of remuneration from the universe of the potentially "illegal remuneration" that the statute circumscribes. This means that labeling the transaction a "discount" does not save the activity from prosecutorial scrutiny because a discount is a kind of remuneration. It means also that for a defendant to be found criminally liable for offering or soliciting illegal remunerations, all the elements of the crime as stated in paragraphs (1) and (2) of § 1320a–7b(b), including the *mens rea* element, must be found beyond reasonable doubt. *See, e.g.,* 64 Fed.Reg. 63,518, 63,519 (1999) ("The anti-kickback statute . . . establishes an intent-based criminal prohibition with optional statutory and regulatory 'safe harbors' that do not purport to define the full range of lawful activity. Rather, the safe harbors provide a means of assuring that payment practices are not illegal. Payment practices that do not fully comply with a safe harbor may still be lawful if no purpose of the payment practice is to induce referrals of Federal health care program business.") In other words, the fundamental analysis required of a trier of fact is "to recognize that the substance rather than simply the form of the transaction should be controlling." 56 Fed.Reg. 35,952, 35,957 (*citing* 123 Cong.Rec. 30,280 (1977), Statement of Chairman of the House Committee on Ways and Means and principal author of H.R. 3 (the Medicare–Medicaid Anti-

Fraud and Abuse Amendments), Representative Rostenkowski).

### 2. *The Purpose of the "Discount Exception"*

As stated in the House Report on the Medicare–Medicaid Anti–Fraud and Abuse Amendments, the reason for excluding certain "practice[s] of discounting the normal course of business transactions" from criminal liability under the statute was to "encourage providers to seek discounts as a good business practice which results in savings to medicare and medicaid program costs." H.R.Rep. No. 95–393, pt. 2, at 54 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3039, 3056. The exception, then, reflects a predictive understanding that competitive pricing schemes within the health care field will lower the cost of health care services and goods.

For these competitively low prices (in the form of discounts or "other reductions") to be exempt from criminal liability, however, they must enure to the benefit of Medicare and Medicaid and of their beneficiaries. Thus, one essential component of this exception is that the federal or state health program share in and benefit from the reduced cost of the services or goods that are being provided at a discount or other reduced price. *See* 64 Fed.Reg. 63,-518, 63,529 (1999) ("Congress intended only to protect discounts that could fairly benefit the Federal health care programs."). The only way to pass on those benefits, however, is if Medicare and Medicaid are made aware of the competitively low costs so that the federal or state system reimburses the provider the percentage of only the reduced price. This is the purpose of the phrase in the exception "properly disclose and appropriately reflected." See additional explanation below in Part V.D.3(b).

In the context of the entire statute, the discount exception makes good sense. The statute was passed to curtail fraud and abuse in Medicare and Medicaid reporting, in particular. It was passed to prevent health care service and good suppliers and providers from depriving the federal and state health care subsidy system of the benefits that a free market for health care services and goods can provide. By allowing for suppliers and providers of health care service and goods to compete with one another in limited forms, the statute strikes a balance: on the one hand, it provides for some of the benefits of a market economy by encouraging limited forms of price competition; on the other hand, it deters and penalizes other types of conduct that would lower the cost of some health care services and goods for some suppliers and providers but would not pass on that lowered cost to the federal and state health systems or to its patients.

### 3. *An Analysis of the Language of the Discount Exception*

In the context of the statute's "carveout" structure and the purpose of the "discount exception," some further points regarding the precise language and meaning of the "discount exception" deserve attention.

#### (a) *"discount or other reduction in price"*

Both the government and defendant fall prey to a false dichotomy when they argue that a crucial distinction exists between "rebate" and "discount" for the purposes of understanding the scope and function of the "discount exception."

In the first instance, the label given the transaction, be it "discount" or "rebate," is not what transforms an otherwise lawful act into a crime. It is not the case, as the government argues, that any rebate is per se illegal remuneration. Nor is it the case, as defense argues, that any discount, "properly disclosed and appropriately reflected", is exempt from criminal liability. What makes the activity illegal is not the label someone attaches to the form of the transaction, even if the form may give rise to the rebuttable inference of illegality.

The reason behind the transaction and the requisite state of mind underlying the criminal act are more significant than form and label. This point will be considered again in Part V.D.4 below.

Another way of explaining this point is to emphasize that the terms used in the statute are broad and are not mutually exclusive. This fact is part of the reason why the provisions defining safe harbors were promulgated in the first place. *See* 56 Fed.Reg. 35,952, 35,952 (1991). For example, a "discount or other reduction in price" as stated in the discount exception (paragraph (3) of § 1320a–7b(b)) is a kind of transferral of value, and thus a kind of remuneration (as that term is used in paragraphs (1) and (2) of § 1320a–7b(b)). *See* 56 Fed.Reg. 35,952, 35,957 (1991) (stating that "Congress's intent in placing the term 'remuneration' in the statute in 1977 was to cover the transferring of anything of value in any form or manner whatsoever" and that the "statute's language makes clear that illegal payments are prohibited beyond merely 'bribes,' 'kickbacks,' and 'rebates,' which were the three terms used in the original 1972 statute"). It cannot be the case, then, that *any* and *every* remuneration is illegal. If that were so, the various exceptions to the statute (¶¶ (A)– (E)) would be meaningless. *See, e.g., United States v. Holmquist,* 36 F.3d 154, 160 (1st Cir.1994) (stating the well-worn principle that a statute shall not be read to render words meaningless). By the same token, a rebate, the statute's example of an illegal remuneration in paragraphs (1) and (2) of § 1320a–7b(b), is also a kind of "discount or other reduction in price," as that phrase is used in the discount exception in paragraph (3) of § 1320a–7b(b). A rebate is typically given after sale and discounts are effected at the time of sale. But both discounts and rebates reduce the overall price of the item purchased and therefore, ideally, they both reduce the cost that would be reimbursed by Medicare or Medicaid. Both rebates and discounts, then, satisfy the purpose of the first exception in

the statute, paragraph (A) of § 1320a– 7b(b)(3).

The government argues that the difference in the time of the price reduction between a rebate and a discount is precisely the issue when, as is the case with this statute, we are concerned with curtailing opportunities for abuse and fraudulent non-disclosure with regard to reimbursement of Medicare and Medicaid costs. But, as explained above and amplified below, rebates are not *per se* illegal remunerations under the statute. A *per se* rule would make little sense in light of the expansion of the scope of activities (such as rebates) that are provided safe harbor in Part (E) of section 1320a–7b(b)(3) under certain circumstances. *See* 42 C.F.R. § 1001.952(h)(1)(iii)(A); 42 C.F.R. § 1001.952(h)(4).

Consider, as bearing on the validity of this analysis, the following evolution of the scope of "discounting" activities protected by the safe-harbor provisions.

When the final rule version of the safe-harbor regulations first came out in 1991, the OIG clarified what kinds of discounts would be within safe harbors under its rules. Those clarifications included the following.

Discounts were only transactions made on an arms length basis and not through a joint-venture or collusive contract. *See* 56 Fed.Reg. 35,952, 35,977 (1991). A discount was not a gift of free "bundled goods," those goods that were closely related to the purchased goods, such as free "surgical packs." *See id.* Discounts included rebate checks, redeemable coupons and credits subject to certain conditions, one of which is that the reductions in prices are attributable to the original good or service that was purchased or furnished. *See* 56 Fed. Reg. 35,952, 35,978 (1991) and 42 C.F.R. § 1001.952(h)(3) (1991). A discount could be an end-of-the-year payment made on the basis of charges or acquisition costs, but only for cost-report providers, and only under certain conditions. *See* 56 Fed.

Reg. 56,952, 35,979 and 42 C.F.R. § 1001.952(h)(1)(i) (1991).

In 1994, the OIG issued further clarifications of its 1991 final rules. *See* 59 Fed. Reg. 37,202, 37,205. Those clarifications included a new paragraph on the scope of the discount safe harbor, saying that

for the purposes of this regulation, a 'rebate' is any discount which is not given at the time of sale. Consequently, a rebate transaction may be covered within the safe harbor if it involves a buyer under § 1001.952(h)(1)(i) or (h)(1)(ii), but it is not covered if it involves a buyer under § 1011.952(h)(1)(iii) because under that provision, all discounts must be given at the time of sale.

*Id.* at 37,205. *See also* 42 C.F.R. §§ 1001.952(h)(1)(iii)(A) (1994) & § 1001.952(h)(4) (1994).

More recently, in 1999, the OIG issued another final-rule version of safe-harbor regulations in order to "add new safe harbor provisions under the Federal and state health care programs' anti-kickback statute, ... and to clarify various aspects of the original safe harbor provisions. Specifically, this final rule modifies the original set of final safe harbor provisions codified in 42 C.F.R. § 1001.952." 64 Fed.Reg. 63,518 (1999). In this most recent iteration of the regulations, the OIG divided the parties to the discounted transaction into three groups—buyers, sellers, and offers of discounts—in order to explain better how to comply with the regulation. *See id.* at 63,526. *See also* 42 C.F.R. § 1001.952(h) (1999).

Also, the 1999 promulgations further defined a "rebate" as not only a discount not given at the time of sale, but one that would not be within a safe-harbor if it "involves a buyer under § 1001.952(h)(1)(iii) that is neither a cost-reporter nor a HMO or CMP [competitive medical plan], because for such buyers, all discounts must be given at the time of sale." *See* 64 Fed.Reg. 63,518, 63,526 (1999). The term "rebate" was expanded,

however, to include "any discount the terms of which are fixed at the time of sale of the good or service and disclosed to the buyer, but which is not received at the time of the sale of the good or service," a modification that enabled the OIG "to extend safe harbor protection to certain charge-based buyers and buyers reimbursed on the basis of fee schedules who obtain rebates." *See id.* at 63,527.

The 1999 final-rule action allowed for credits and coupons to qualify for safe-harbor protection, as long as they meet certain criteria, and also provided that in certain circumstances discounts on multiple items would qualify as a "discount" for safe-harbor purposes where the reimbursement methodology for all discounted items or services is the same. *See id. See also* 42 C.F.R. § 1001.952(h)(5)(i) & (ii) (1999).

The evolution of the term "discount" over the past decade demonstrates the OIG's attempt to encourage a broad range of commercial transactions in a changing marketplace while at the same time monitoring the structure of those transactions for potential fraud and abuse. The changing scope of the meaning of the word "discount" under the safe-harbor regulation is also evidence of the fact that it is a fluid term that encompasses certain kinds of "rebates" but not others, and encompasses certain kinds of credits, but not others. Terms like "discount" and "rebate" then, contrary to how the government and defense would have it, are not mutually exclusive, even in the safe-harbor regulations that purport to be defining them in ways arguably narrower than in the statutory "discount exception."

In sum, for the purposes of interpreting the "discount exception" (paragraph (A) of § 1320a–7b(b)(3) of the anti-kickback statute, as opposed to paragraph (E), the safe-harbor regulations), a rebate is a kind of discount, as well as a kind of reduction in price. Both can be a form of remuneration that if offered or received with the

requisite *mens rea,* might be considered "illegal remuneration" under the statute, and thus cannot be barred entirely from consideration under the "discount exception."

### (b) *"properly disclosed and appropriately reflected"*

### (i) The Parties' Arguments

■ Any "discount or other reduction in price" must be "properly disclosed and appropriately reflected" in order to qualify for immunity from criminal liability under the exemption. Defendant argues that this limiting language in the discount exception should be read in the disjunctive as "properly disclosed *or* appropriately reflected." Defendant so argues because, he says, a conjunctive reading would hold a seller-supplier of health care goods and services (like MPD) criminally liable for the non-reporting of the costs by the buyer-provider, as it is the buyer-provider of the goods and services who has the responsibility for filing the cost reports for proper reimbursement from Medicare and Medicare. *See, e.g.,* 42 C.F.R. § 413.20. This, defendant says, "would lead to several contradictory and even absurd results," such as nullifying the statute's scienter requirement and creating an "unprecedented executory period during which both the supplier offering a price reduction and the provider accepting the price reduction would be exposed to criminal liability for a period of time" before the cost report is filed with Medicare or Medicaid. Docket No. 102 at 13–15.

Defendant supports his argument that the phrase at issue should be read in the disjunctive with, in addition to assertions stated above, the assertion that the key distinction between a lawful price reduction and an unlawful one under the statute is full and accurate disclosure of the reduction in price. If a seller-supplier discloses the amount and method of the reduction in price to the buyer-provider whose responsibility it is to report the reduced costs to Medicare or Medicaid, then, the defendant contends, the discount exception has been satisfied and the purpose of the statute fulfilled.

The government's principal response is that disclosure is not enough. The statute calls for "proper disclosure," which the government interprets as requiring "full disclosure of the material terms of the transaction." Docket No. 128 at 23. To this the defendant says that the government's suggestion that the exception requires the disclosure of "material terms" is reading too much into the statute; "full and accurate disclosure of the price reduction" is all that is required. *See* Docket No. 133 at 12.

In response to defendant's argument about the disjunctive reading of the phrase "properly disclosed and appropriately reflected," the government does not question defendant's assertion that the "and" should be understood as an "or." Instead, the government says the absurdities that defendant suggests arise from a conjunctive reading are ameliorated by the various provisions of the regulatory safe harbor that protects a seller-supplier who offers a discount to a buyer-provider and also takes all reasonable steps to ensure that the value of the discount is passed through to Medicare or Medicaid, even when it is a buyer-provider who has the duty to report the reduction in price to the federal or state system.

It is true that the regulatory safe harbors provide detailed instructions on how a buyer-supplier may discharge its reporting duty and avoid criminal liability. *See, e.g.,* 42 C.F.R. §§ 1001.952(h)(1), 1001.952(h)(2)(ii). Those provisions, however, apply only in very specific instances, when the buyer-supplier is a certain kind of entity and the reduction in price a certain form of discount or rebate as defined by the safe-harbor provision. *See id. See also United States v. Bay State Ambulance and Hospital Rental Service,* 874 F.2d 20, 31 (1st Cir.1989). For the reasons stated previously (*see* Part V.C

above), I do not consider the discount exception and the safe-harbor provisions so separate as not to be worthy of attention when determining the meaning of one or the other. They may be better understood as separate exceptions within a coordinated framework. A defendant may assert either as a defense or both as defenses. They are not irrelevant, one to the other, when the task at hand is to determine the scope and meaning of either or both. For the purposes of applying the phrase at issue in the "discount exception" to the facts of this case, however, the details of the safe-harbor provisions immunizing a specific kind of buyer from criminal liability under specific circumstances do not control a proper understanding of the "discount exception" that I am asked to interpret and apply.

(ii) A Close Reading of *"properly disclosed and appropriately reflected"*

With regard to the issue of what constitutes "proper" and "appropriate" disclosure, the memoranda of the parties speak at cross purposes. The statute requires disclosure and reflection of the costs incurred in order to satisfy the purposes of the statute—to pass on the benefits of the price reduction to Medicare or Medicaid. The government's suggested reading that the "material terms" of the transaction be disclosed is unpersuasive. It begs two questions: material to whom and in what context? The parties to the transaction might consider many more terms "material" than those needed by Medicare or Medicaid for reimbursement purposes. What the parties to the transaction may consider material, however, is not decisive as to whether the purpose of the statute is satisfied. The statute aims at reduction of the price of the goods or services through disclosure, so a lower price can be reflected in lower costs claimed from or charged to a federal health care program. In this way, the federal health program may benefit from a reduction in price offered and received. Whether disclosures are "proper" and "appropriate," as the

statute requires, will depend on the details of the transaction as proved at trial and under appropriately fashioned instructions to the jury about the law they are to apply so as to understand the questions of fact they are to decide.

With regard to arguments about the conjunctive or disjunctive reading of the phrase "properly disclosed and appropriately reflected," both parties misconstrue the meaning of that phrase in the context of the "discount exception" as a whole. The phrase is properly read in the conjunctive but the effect of such a conjunctive reading does not create the conundrum that defendant suggests it does.

In order for the statute (1) to prohibit both offers and acceptances of illegal remunerations and (2) to encourage certain "discounts and other reductions in price" that would increase competition and reduce health care costs, the "discount exception" must apply to both those who offer and those who accept "discounts and other reductions in price." (The statute's criminal prohibition does, in fact, apply to both those who make offers, *i.e.*, to the seller-supplier, and those who accept offers, *i.e.*, the buyer-provider. *Compare* paragraph (1) with paragraph (2) of § 1320a–7b(b).) Defendant's argument that the "discount exception" protects only those who are asking for reimbursement directly from Medicare or Medicaid and not those who offer the "discount or other reduction in price," (for whom direct reimbursement from Medicare or Medicaid is never a part of daily business practice or an incentive) misreads the exception by misconstruing its grammatical structure.

Defendant argues that by force of the wording in the paragraph, the phrase "properly disclosed and appropriately reflected" relates only to the buyer-provider. This is not correct. To come to a proper understanding of the phrase "properly disclosed and appropriately reflected," one must read this phrase in relation to its

neighboring clauses. The entire paragraph is as follows:

Paragraphs (1) and (2) shall not apply to—

(A) a discount or other reduction in price obtained by a provider of services or other entity under a Federal health care program if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity under a Federal health care program.

42 U.S.C. § 1320a–7b(b)(3)(A). Close reading reveals that the verbs "disclose" and "reflect" describe the required activities for both "provider" and "entity". The phrase "costs claimed . . . by the provider" refers to those costs claimed to Medicare or Medicaid by the buyer-provider. The phrase "charges made by the . . . entity" refers to those costs charged to the buyer-provider by the seller-supplier. Both phrases are modified by the phrase "properly disclosed and appropriately reflected," which describes the required reporting activities for both the "provider" and the "entity." Thus both parties to the transaction, the seller-supplier and buyer-provider, must properly disclose and appropriately reflect the reductions in price in order to find shelter under the discount exception.

Transforming the "and" between "properly disclosed and appropriately reflected" into an "or" is both unnecessary and inappropriate under a proper reading of the paragraph. Both buyer-providers and seller-suppliers are required to "properly disclose[ ] and appropriately reflect[ ]" the reduction in price offered or received for Medicare or Medicaid reimbursable goods or services in order to avoid criminal liability.

### 4. The Scienter Requirement

 The proper interpretation and application of the "discount exception," in light of the above three sections explaining its form and content, may be aided by a brief diversion into a discussion of the statute's scienter requirement. As stated above in Parts V.C and V.D.2, the "discount exception" acknowledges that profit motive does not necessarily trigger criminal liability. Offering or receiving discounts in order to compete for business does not alone mean that the entity "knowingly and willfully" induced or arranged for referrals or for other business reimbursable under the Medicaid or Medicaid programs. The "discount exception" was written into the statute from its inception in 1977 to allow for and acknowledge the benefits of competition between health care suppliers and providers, a competition that is based, in part, on a basic profit motive. See H.R.Rep. No. 95–393, pt. 2, at 53 (1977), reprinted in 1977 U.S.C.C.A.N. 3039, 3056 (stating that "discount exception" should "encourage providers to seek discounts as a good business practice which results in savings to medicare and medicaid program costs"). Thus, profit motive as evidenced by the offer or acceptance of a "discount or other reduction in price" is not sufficient to support a finding of the state of mind necessary to convict under the statute.

Consider the following discussion by the OIG regarding the importance of the intent requirement when deciding criminal liability under the statute.

[I]t is unfortunately not possible to provide safe harbor protections for all business arrangements that are not abusive. There are certain arrangements that, although themselves legitimate, are structurally so similar to abusive arrangements that protection by way of new safe harbor provisions will inevitably also protect abusive practices as well. For example, equipment rental arrangements made between parties in a position to make and accept referrals do not receive safe harbor protection if the payments are based on utilization (sometimes known as the "wear and tear" clause). We recognize that equipment becomes less valuable the more it is used, and that its owner deserves com-

pensation for such wear and tear. However, it is also a relatively easy matter to disguise such a wear and tear payment as a payment for referrals. Thus, we need to examine the intent of the parties on a case-by-case basis even though a large majority of such payments may represent only legitimate compensation to the owner of the equipment. The recent case, *United States v. Bay State Ambulance and Hospital Rental Service, Inc.,* ... emphasizes that the gravamen of the violation of the statute is "inducement" and not necessarily the structure of the arrangement. Thus, such case by case inquiries must necessarily focus on the intent of the parties.

56 Fed.Reg. 35,952, 35,955 (1991).

Several reported cases also address this issue of intent under the statute. The United States Court of Appeals for the Third Circuit, in *United States v. Greber,* 760 F.2d 68 (3d Cir.1985), held that, all other elements being satisfied, the statute is violated "if one purpose of the [remuneration] is to induce future referrals" of Medicare or Medicaid reimbursable business, "even if the payments were also intended to compensate for professional services." *Id.* at 72. In *United States v. Kats,* 871 F.2d 105 (9th Cir.1989), the court adopted the Third Circuit's reasoning and upheld a jury instruction that read:

> It is not a defense that there might have been other reasons for the solicitation of a remuneration by the defendants, if you find that one of the material purpose for the solicitation was to obtain money for the referral of services.

871 F.2d at 108 n. 1. Most recently, the United States Court of Appeals for the First Circuit upheld a district court's jury instruction charging that under the anti-kickback statute

> the defendants could only be found guilty if the payments were made primarily as inducements [for purchasing or referring medicare reimbursable business] ... If you find the payments

were made for two or more purposes, then the government has to prove that the improper purpose is the primary purpose or was the primary purpose in making and receiving the payments....

*Bay State Ambulance,* 874 F.2d at 30. "The gravamen of Medicare Fraud is inducement," the Court of Appeals for the First Circuit declared, making it clear that the willful-and-knowing element of the crime is a touchstone for the proper evaluation of both the statute's meaning and the application of its "discount exception." *Id.* at 29.

All of these cases confirm that the issue for a jury to decide, when faced with a defendant whose contention is that the defendant is not criminally liable under the statute due to the "discount exception," is whether the reason for offering or accepting the "discount or other reduction in price" was to induce referrals of or be reimbursed for federal health care program business. It may be the case that one piece of evidence to weigh when considering whether defendant acted with the requisite intent is whether the "discount or other reduction in price" was passed on to the Medicare or Medicaid program. It also may be the case that the profit motive was so strong—the defendant was so severely in debt or the amount of profit was so enormously high—that a jury could infer that profit motive supports an inference of willful and knowing purpose to induce referrals of or be reimbursed for federal health care program business. None of this permits, however, an instruction to the jury that an inference that it makes good sense in business practice to increase profits precludes the possibility of a defendant's invoking immunity under the "discount exception."

### 5. The Application of the "Discount Exception" at Trial

■ For the reasons explained above in the explanation of the structure, purpose and language of the "discount exception," and of intent element of the crime, the

defendant's motion to dismiss must be denied.

The indictment contains all the elements of the charged offense of conspiring to commit an offense against the United States, to wit, knowingly, willfully and intentionally to offer and pay illegal kickbacks to obtain referrals of laboratory business in violation of 42 U.SC. § 1320a–7b(b)(2)(B). *See* Docket No. 46 at ¶ 70.

Defendant's argument that he should prevail on his motion because the overt acts charged as part of the conspiracy—the allegedly illegal remunerations—are protected by the "discount exception" of the statute as a matter of law, relies on the erroneous legal premise that the statute requires that the government state in the indictment that the defendant's conduct does not fall within the "discount exception." As explained in the preceding parts of this Opinion, however, the "discount exception" does not serve as an additional element of the criminal offense. It serves, instead, as a framework around which arguments of the parties regarding the evidentiary issues, such as how the government is to prove beyond a reasonable doubt that the defendant acted with the requisite state of mind, may be presented during trial.

For example, if during trial evidence is proffered by the government or by a defendant that a discount or other reduction in price was disclosed or otherwise reflected in the costs claimed or charges made, it may be necessary for the court to make some evidentiary rulings and, depending on such proffers and rulings, it may be necessary to include in the Charge to the Jury some instruction on how disclosure of those price reductions may affect their verdict. Those matters are reserved for later determination, if they are presented at trial, and are not addressed in this Opinion.

Also, the aspects of the Charge to the Jury that concern the willfulness element of any offense charged are not decided now but will be considered immediately before and during trial.

In light of the issues that are addressed and the rulings that are made in this Opinion, Defendant Shaw's Motion to Dismiss for Failure to State a Crime will be dismissed in the order that follows this Opinion.

## VI. Motion to Dismiss on Statute–of–Limitation Grounds

Defendant Shaw has also filed a motion to dismiss the indictment against him because, as he argues, it was returned after the five-year statute of limitation period expired. *See* Docket Nos. 43 and 104. Defendant argues that the limitation period began to run when Shaw effectively withdrew from the conspiracy at the time of his retirement from NMC, when he abandoned his alleged role in the conspiracy as the president of MPD, the seller-supplier. Even taking as undisputed the fact that the indictment dated February 10, 1999, was returned against Shaw five years, two months and one week after he retired from NMC on December 3, 1999, I cannot allow defendant's motion to dismiss on statute-of-limitation grounds. Reasons are identified immediately below.

*First.* Defendant is charged with violating 18 U.S.C. § 371, the overt act conspiracy statute. The overt acts alleged in the indictment are at paragraph 73(g), which comprises seven pages of a chart detailing the dates, amounts and form of payment from dialysis facilities external to NMC. *See* Docket No. 46 at ¶ 73(g). Many of these transactions are dated after defendants alleged retirement from NMC. *See id.* Thus, on its face, the indictment charges the commission of overt acts in furtherance of the conspiracy of which the government alleges the defendant was a part within the statute-of-limitation period. *See, e.g., United States v. Fitzpatrick,* 892 F.2d 162, 167 (1st Cir.1989); *Grunewald v. United States,* 353 U.S. 391, 396–97, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).

*Second.* Defendant's contention that he effectively withdrew from the conspiracy, was no longer a member of the conspiracy, and was no longer liable for the acts of his coconspirators that were committed after his retirement in December 3, 1993, relies on issues of fact that must be submitted to a jury. *See, e.g., United States v. Sepulveda,* 15 F.3d 1161, 1190 (1st Cir.1993) (citing cases and discussing "bedrock" principles of the law of conspiracy, especially those surrounding membership that are for the jury to resolve). One factual issue to be resolved, for example, is whether his retirement effected his withdrawal from the conspiracy. Did his retirement end his involvement with NMC entirely? Although courts have recognized that a defendant can withdraw from a business conspiracy (a conspiracy carried out through the regular activities of an otherwise legitimate business enterprise) by severing his ties to the business, the effectiveness of the withdrawal depends in large part on the showing that employment at the business was essential to the defendant's involvement in the alleged conspiracy and that the defendant no longer maintained any ties with the business. *See, e.g., Morton's Market, Inc. v. Gustafson's Dairy, Inc.,* 198 F.3d 823 (11th Cir.1999); *United States v. DePeri,* 778 F.2d 963, 980 (3d Cir.1985); *United States v. Lowell,* 649 F.2d 950, 955 (3d Cir.1981). *Cf. United States v. Nerlinger,* 862 F.2d 967, 974 (2nd Cir.1988). *See also United States v. Fitzpatrick,* 892 F.2d 162, 167 (1st Cir.1989) (with regard to a statute-of-limitation defense, agreeing with the Court of Appeals for the Fifth Circuit that a conspiracy continues until anticipated economic benefits of the defendant are realized). Another factual issue to be decided, related to the first, is whether defendant's retirement from NMC was an affirmative act that disavowed or defeated the purpose of the conspiracy, in light of the case law that says that mere cessation of conspiratorial activity is not enough to effect a withdrawal. *See United States v. Juodakis,* 834 F.2d 1099, 1102 (1st Cir.1987);

*United States v. Borelli,* 336 F.2d 376, 388 (2d Cir.1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965).

In short, whether the prosecution of Shaw is time-barred turns on issues of fact that go to the evidence of the alleged offense itself—his membership in and alleged withdrawal from the conspiracy alleged in the indictment. For these reasons, defendant's motion to dismiss the indictment against him will be denied in the order below.

## VII. Matters Remaining to be Decided

The following pretrial motions remain pending in this case:

(1) Motion of Defendants Aird and Verde to Dismiss Counts 1 and 10–17 of the Superseding Indictment for Failure to State a Crime (Docket No. 142);

(2) Motion of Defendants Aird and Verde to Strike Surplusage (Docket No. 153);

(3) Defendants' Joint Motion for Reconsideration of Magistrate's Ruling on Pretrial Motions (Docket No. 124);

(4) Defendant Shaw's Motion for Relief from Prejudicial Misjoinder Pursuant to Fed.R.Crim.P. 8(b) (Docket No. 113);

(5) Defendant Aird's Motion for Relief from Prejudicial Misjoinder Pursuant to Fed.R.Crim.P. 8(b) (Docket No. 115);

(6) Defendant Verde's Motion for Relief from Prejudicial Misjoinder Pursuant to Fed.R.Crim.P. 8(b) (Docket No. 117).

These outstanding motions will be the subject of forthcoming memoranda and orders.