[No. B232188. Second Dist., Div. Four. Apr. 24, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
RITA GUIAMELON, Defendant and Appellant.

388

COUNSEL

Hooper Lundy & Bookman and Patric Hooper for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Mary Sanchez and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

EPSTEIN, P. J.—Dr. Rita Guiamelon, a physician, challenges her conviction under Business and Professions Code section 650 (section 650) for paying illegal fees to persons who referred patients qualified for federal and state programs to her practice. She contends this statute is preempted by the federal Medicaid antikickback statute (42 U.S.C. § 1320a-7b(b)) under the doctrines of implied conflict and obstacle preemption. Her conflict preemption argument is that the federal antikickback statute requires a higher scienter than does section 650, making compliance with both federal and state law impossible. Guiamelon's obstacle preemption argument is that as applied to her, section 650 is an obstacle to the congressional objective of providing health care services to the underserved. We conclude that conflict preemption is not applicable because the federal antikickback statute supplements rather than supplants the remedy under section 650. Obstacle preemption is not established because the purpose of section 650 is consistent with the purpose underlying the federal antikickback statute.

Alternatively, Guiamelon argues section 650 is unconstitutionally vague and that it improperly infringes on the marketing of physician's services to the uninsured. She also claims that in light of expressed legislative intent to extend healthcare services to the uninsured, we should interpret section 650 as not applying in the particular circumstances of this case. Finally, Guiamelon raises a First Amendment challenge.

We decline to construe section 650 to add a scienter requirement not included in the statute as enacted. Section 650 is not unconstitutionally vague and we find no other basis to exempt Guiamelon from prosecution under its terms. We reject her First Amendment challenge, finding that section 650 does not regulate activity protected by the First Amendment.

## FACTUAL AND PROCEDURAL SUMMARY

The facts in this case are straightforward although the underlying statutory scheme is not. Guiamelon began her practice in the Philippines. She moved

to the United States in 1985 and was licensed as a physician here in 2003, with a specialty in pediatrics. She opened a solo practice and became a provider for various federal and state health programs for the poor, which we describe below. She treated primarily low-income Spanish-speaking patients. Guiamelon unsuccessfully tried to increase her client base through various marketing measures, including distribution of fliers, billboards, and participation in health fairs. She was approached by marketers who claimed they could bring her patients. Guiamelon subsequently engaged marketers to bring patients to her, by either driving them to her office, or directing them there. Between 2007 and 2009, she saw 25 to 30 patients a day, one-third of them brought to her by these marketers.

Guiamelon used personal checks to pay the marketers $20 for each referred patient who was qualified to enroll, and who did enroll, in a federal or state health care program. She documented the payments and issued Internal Revenue Form 1099 to the marketers, and reported these payments on her state and federal tax returns as business expenses. Guiamelon did not know what "capping" meant, and did not consider her payments to the marketers to be kickbacks, rebates, or commissions.

Carmen Casmiro Porras testified that she was paid by Guiamelon to bring young people and children to Guiamelon's office for services from 2007 to 2009. She said 12 other marketers also were working for Guiamelon. Porras handed out cards offering free medical services and transportation to a health care provider, with Guiamelon's contact information on them. Porras brought five to six patients to Guiamelon's clinic every day it was open. She would give Guiamelon a list of the patients she brought into the practice. Guiamelon would count the patients, and every 15 to 20 days personally gave Porras a check as payment for each qualified patient. People's exhibit No. 6 was identified by Porras as lists of patients she had procured for Guiamelon in order to receive payment. The entries indicate the program for which the patient applied.[1] Porras was paid $20 per patient for each patient who enrolled in the Child Health and Disability Prevention Program (CHDP) and Family Planning Access Care and Treatment (Family PACT).[2] Guiamelon provided Porras with IRS forms to report the payments.

Guiamelon came to the attention of the California Department of Justice, Bureau of Medi-Cal Fraud, in the course of its investigation of a dentist who used Porras's services. Special Agent Rochelle Plue followed Porras's vehicle to Guiamelon's office. A subsequent surveillance of Guiamelon's office revealed that it was very busy, and that many cars, including a vehicle driven

---

[1] Porras pled guilty to charges arising from her work for Guiamelon and testified pursuant to a plea bargain.

[2] These programs are described below.

by Porras, dropped off individuals in the parking lot and left. A search warrant was executed at Guiamelon's office. Records were found documenting payments of about $20 per patient to various marketers for the period from 2007 through April 2010. Guiamelon told Special Agent Craig Black that she employed four or five marketers who were paid $20 for each patient determined to be eligible for enrollment in federal and state health care programs. At trial, she testified that the applications she signed to become a provider under Medi-Cal, CHDP, and Family PACT contained her declaration that she would abide by all the rules and regulations of each program.

An amended complaint charged Guiamelon (and three codefendants) with grand theft (count I; Pen. Code, § 487), presenting false Medi-Cal claims (count II; Welf. & Inst. Code, § 14107, subd. (b)(1)), receiving unlawful Medi-Cal remuneration (count III; Welf. & Inst. Code, § 14107.2, subd. (b)), and with offering rebates for patient referrals (count IV; Bus. & Prof. Code, § 650, subd. (a)). The trial court dismissed counts I and II on Guiamelon's motion (Pen. Code, § 995). The jury convicted Guiamelon on count IV and acquitted her on count III. After denying Guiamelon's motion for new trial, the trial court suspended imposition of sentence and placed her on a three-year formal probation. This is a timely appeal from the judgment of conviction.

## DISCUSSION

### I

Our analysis begins with a summary of pertinent aspects of the complex federal and state statutory scheme arising from the Social Security Act (42 U.S.C. § 301 et seq.). That statutory scheme provides the framework for this case. It is a system described as " 'among the most intricate ever drafted by Congress' " and so " 'Byzantine' " in its construction as to be " ' "almost unintelligible to the uninitiated." ' " (*Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 810 [135 Cal.Rptr.2d 1, 69 P.3d 927] (*Olszewski*), quoting *Schweiker v. Gray Panthers* (1981) 453 U.S. 34, 43 [69 L.Ed.2d 460, 101 S.Ct. 2633].)

### A. *Medicaid*

"In 1965, Congress established Medicaid by enacting title XIX of the Social Security Act (42 U.S.C. §§ 1396–1396v; see *Schweiker v. Gray Panthers*, [*supra*,] 453 U.S. [at p.] 36 . . . (*Schweiker*)). 'The Medicaid program . . . is a cooperative endeavor in which the Federal Government provides financial assistance to participating States to aid them in furnishing health care to needy persons. Under this system of "cooperative federalism,"

[citation] if a State agrees to establish a Medicaid plan . . . the Federal Government agrees to pay a specified percentage of "the total amount expended . . . as medical assistance under the State plan. . . ." ' (*Harris v. McRae* [(1980)] 448 U.S. [297,] 308 [65 L.Ed.2d 784, 100 S.Ct. 2671].) Participation is voluntary, but 'once a State elects to participate, it must comply with the requirements of Title XIX.' (*Id.* at p. 301 . . . .)" (*Olszewski, supra,* 30 Cal.4th at p. 809.) " 'Congress intended that states be allowed flexibility in developing procedures for administering their statutory obligations under the Medicaid statute and their state plans.' [Citation.]" (*Id.* at p. 810.)

Carol Lambert, a nurse consultant with the State Department of Health Care Services in the Division of Audits and Investigations and an expert witness for the prosecution, testified that prior to 2009, Medicaid and Medi-Cal shared equally in the cost of reimbursing a provider for services.[3]

B. *Medi-Cal*

California's program under Medicaid is Medi-Cal. "Welfare and Institutions Code section 14000 declares that '[t]he purpose [of the Medi-Cal program] is to afford health care and related remedial or preventive services to recipients of public assistance and to medically indigent aged and other persons . . .'; thus, the program's primary objective is to alleviate the hardship and suffering incurred by those who cannot afford needed medical care by enabling them to obtain such medical treatment." (*Committee to Defend Reproductive Rights v. Myers* (1981) 29 Cal.3d 252, 271–272 [172 Cal.Rptr. 866, 625 P.2d 779], fn. omitted.)

According to Lambert, Medi-Cal is "both a state and federally funded program for low income individuals who either do not have insurance or have no access to health services through any other insurer." It is administered by the State Department of Health Care Services. She explained that the "Medi-Cal program makes services possible to eligible beneficiaries or recipients through enrolled providers and there is a formalized process through which a physician . . . would apply to the Department of Health Care Services principally through the provider enrollment division."

C. *Child Health and Disability Prevention Program*

Guiamelon was an approved provider for the CHDP. (Health & Saf. Code, § 120425 et seq.) In creating this program in 1995, the Legislature declared

---

[3] According to Lambert, in 2009 the federal Affordability of Care Act reduced California's share of this reimbursement rate based on the unemployment rate in California.

that "a community-based program of early identification and referral for treatment of potential handicapping conditions will be effective in reducing the incidence of the conditions and will benefit the health and welfare of the citizens of this state. [¶] It is the intent of the Legislature in enacting this article and Section 120475 to establish child health and disability prevention programs, that shall be financed and have standards established at the state level and that shall be operated at the local level, for the purpose of providing early and periodic assessments of the health status of children." (Health & Saf. Code, § 124025.) The Legislature further declared its intent that these programs make maximum use of existing health care resources so that the health screening programs are fully integrated with existing health services. (*Ibid.*) It was intended that "outreach programs be developed to stimulate the use of preventative health services . . . ." (*Ibid.*)

Lambert testified that CHDP "is directly related to the Medi-Cal program." She explained: "Many of the eligible beneficiaries, eligible patients for Child Health and Disability Prevention Services are Medi-Cal beneficiaries." CHDP is also administered by the State Department of Health Care Services. A beneficiary may become enrolled in CHDP by going to a physician who is an approved Medi-Cal provider and "declar[ing] to the provider that they are California residents, that the children in the family are under the age of 19, and that their family income is at a certain level that is at or below 200 percent of the federal poverty line."

The first page of the CHDP application form describes the evolving focus of the program: "When the CHDP program was implemented in 1973, its primary purpose was to implement Federal Medicaid Early and Periodic Screening mandates in California. Over the years, the program has expanded to assure that all low-income children and youth in California have access to preventive health care services. The program has been financed by State funds . . . to provide non-Medi-Cal eligible children and youth younger than 19 years of age with the same services as available to Medi-Cal recipients younger than 21 years of age. [¶] . . . Effective July 2003 the CHDP program is a 'Gateway'[4] maximizing the enrollment of uninsured children and youth

---

[4] "Presumptive eligibility is an optional federal program through which low-income uninsured children up to age 19 may obtain temporary Medi-Cal benefits before their eligibility for ongoing Medi-Cal has been determined. (42 U.S.C. § 1396r-1a; Welf. & Inst. Code, § 14011.7.) California implemented the Gateway program on July 1, 2003, as a vehicle for establishing presumptive eligibility, also referred to as 'pre-enrollment.' The Gateway program expanded health care coverage by drawing in uninsured children under the age of 19 from families with incomes of up to 200 percent of the federal poverty level, and to encourage them

in Medi-Cal or Healthy Families[5]. Many of the children and youth served otherwise would not have been eligible for, or enrolled in, other health care." Lambert testified that Gateway is to provide services to the child while he or she is applying for Medi-Cal.

D. *Family PACT*

Guiamelon also was an approved provider of services under the Family PACT program. This program was established "to provide comprehensive clinical family planning services to any person who has a family income at or below 200 percent of the federal poverty level . . . and who is eligible to receive these services pursuant to the waiver identified in [Welfare and Institutions Code section 14132, subdivision (aa)](2)." (Welf. & Inst. Code, § 14132, subd. (aa).) Lambert explained that the only way a provider can become a Family PACT provider is to first be enrolled in the Medi-Cal program. "A beneficiary or recipient could enroll in the Family PACT program simply by presenting him or herself to an FPACT provider and filling out a paper form that identifies their residence and . . . their level of family income." The provider then issues a Health Access Program Card.

To participate in Medi-Cal, Family PACT, and CHDP a provider, such as Guiamelon, must agree to comply with all applicable rules and regulations. Lambert referred to paragraph 19 of People's exhibit No. 3, a blank Medi-Cal provider agreement, which states: "Provider agrees that it shall not offer, give, furnish, or deliver any rebate, refund, commission preference, patronage dividend, discount, or any other gratuitous consideration, in connection with the rendering of health care services to any Medi-Cal beneficiary. . . . Provider further agrees that it will not take any other action or receive any other benefit prohibited by state or federal law." This form is given to all enrolled providers, who must keep a copy for future reference. Similar

---

to apply for ongoing coverage in the Medi-Cal and Healthy Families programs. The Department refers to the Gateway program as providing a temporary safety net for indigent children to receive benefits." (*Armando D. v. State Dept. of Health Services* (2004) 124 Cal.App.4th 13, 17 [21 Cal.Rptr.3d 66], fns. omitted.)

Prosecution witness Lambert testified that the services in the Gateway program are the same as for Medi-Cal children in CHDP. She said "[t]he only difference is that the children and youth coming into the Gateway program may not be Medi-Cal recipients. They may not have applied for Medi-Cal. [¶] The intent of the Gateway program is to get children and youth into care and so there is a process where the family can go to the provider, state to the provider that the child is in need of a health assessment, and complete . . . an application process, and then they are regarded to be eligible for all services through the CHDP program for two months." Such beneficiaries are encouraged to apply for Medi-Cal during this two-month period.

[5] In 1997, the Legislature enacted the Healthy Families Act (Ins. Code, § 12693 et seq.) to provide low-cost insurance to children under 19 years of age who do not qualify for no-cost Medi-Cal. (Ins. Code, §§ 12693, 12693.04; *Armando D. v. State Dept. of Health Services, supra*, 124 Cal.App.4th at p. 17, fn. 4.)

language appears in the Family PACT provider agreement form but not in the CHDP provider agreement. Family PACT services are reimbursed through the Medi-Cal Fund and federal funds.

### E. Federal and California Antikickback Laws

#### 1. The Federal Antikickback Law

The antikickback provision of the federal health care programs is codified in title 42 United States Code section 1320a-7b(b) (the federal antikickback statute). At the times relevant here, it provided: "(b)(2) [w]hoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—[¶] (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . [¶] . . . [¶] shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both." Subdivision (f) of section 1320a-7b defines federal health care program, as "(2) any State health care program, as defined in section 1320a-7(h) of this title." The definition of state health care program includes "a State plan under subchapter . . . XXI . . ." of this chapter. (42 U.S.C. § 1320a-7h(e)(4).)[6]

The purpose of the statute is "to strengthen the government's ability to prosecute and punish fraud in the system."[7] (*Hanlester, supra,* 51 F.3d at p. 1396.) "[T]here can be no doubt that the statute is an economic regulation which allows for greater latitude by Congress—the Medicare Fraud statute is directed at drains on the public fisc." (*U.S. v. Bay State Ambulance & Hospital Rental Service, Inc.* (1st Cir. 1989) 874 F.2d 20, 32.)

Language was added in 1977 amendments "prohibiting (1) the solicitation or receipt of 'any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind,' in return for referrals, and (2) the offer or payment of such remuneration to 'induce' referrals. Medicare-Medicaid Anti-fraud and Abuse Amendments, Pub.L.

---

[6] Exceptions to the federal antikickback statute are codified in 42 United States Code section 1320a-7b(b)(3) and in elaborate safe harbor provisions (*U.S. v. Jain* (8th Cir. 1996) 93 F.3d 436, 440, citing 42 C.F.R. § 1001.952).

[7] The 1977 amendments "made it a misdemeanor to solicit, offer, or receive a 'kickback, bribe, or rebate' in connection with furnishing covered services or referring a patient to a provider of those services. Social Security Amendments of 1972, Pub.L. No. 92-603, § 242(b), (c), 86 Stat. 1419." (*Hanlester Network v. Shalala* (9th Cir. 1995) 51 F.3d 1390, 1396, fn. 7 (*Hanlester*).)

No. 95-142, 91 Stat. 1175, 1182 (1977). Congress also upgraded the violation to a felony." (*Hanlester, supra*, 51 F.3d at p. 1396, fn. omitted.) The purpose of these amendments "was to address the 'disturbing degree [of] fraudulent and abusive practices associated with the provision of health services financed by the medicare and medicaid programs.' See H.R. Rep. No. 95-393, pt. 2, at 44 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3039, 3047." (*U.S. v. Shaw* (D.Mass. 2000) 106 F.Supp.2d 103, 110.)

In 1980, Congress added the requirement that the defendant act knowingly and willfully. (Pub.L. No. 96-499, § 917; H.R. No. 96-1167, 96th Cong., 2d Sess., at p. 59 (1980), 1980 U.S. Code Cong. & Admin. News, at pp. 5526, 5572.) The House Report on the 1980 amendment explains: "The section [(42 U.S.C. § 1320a-7b(b))] provides that criminal penalties for solicitation or payment of kickbacks, bribes, rebates, or other remuneration in exchange for medicare or medicaid business apply only in cases where such conduct is undertaken knowingly and willfully. [¶] Under current law, the solicitation or receipt of any remuneration in return for referring a medicare or medicaid patient to another party or in return for purchasing, leasing or ordering any service or supply covered under medicare or medicaid constitutes a felony, punishable by a fine of up to $25,000 or 5 years imprisonment, or both. The offer or payment of kickbacks, bribes, or rebates for such purposes is also a felony, punishable to the same extent. *The committee is concerned that criminal penalties may be imposed under current law to an individual whose conduct, while improper, was inadvertent. Accordingly, the section clarifies current law to assure that only persons who knowingly and willfully engage in the proscribed conduct could be subject to criminal sanctions.*" (1980 U.S. Code Cong. & Admin. News, at pp. 5526, 5572, italics added; see also *Hanlester, supra*, 51 F.3d at p. 1399, fn. 16 ["legislative history demonstrates that Congress, by use of the phrase 'knowingly and willfully' to describe the type of conduct prohibited under the anti-kickback laws, intended to shield from prosecution only those whose conduct 'while improper, was inadvertent' "].)

"In 1987, Congress consolidated the anti-kickback laws for Medicare and state health care programs into § 1128B(b) of the Social Security Act, 42 U.S.C. § 1320a-7b. . . . Medicare and Medicaid Patient and Program Protection Act of 1987, Pub.L. No. 100-93, 101 Stat. 680, 681–682, 689." (*Hanlester, supra*, 51 F.3d at p. 1396.) Congress also directed the Secretary of Health and Human Services (HHS) to promulgate regulations specifying payment practices that shall not be treated as a criminal offense, referred to as safe harbors. (42 U.S.C. § 1320a-7b(b)(3)(D).) (*U.S. v. Bay State Ambulance and Hosp. Rental Service, Inc., supra*, 874 F.2d at pp. 30–31; Medicare and Medicaid Patient and Program Protection Act of 1987 (Pub.L. No. 100-93 (Aug. 18, 1987) 101 Stat. 683, § 14(a)).)

In 2010, as part of the Patient Protection and Affordable Care Act (PPACA; Pub.L. No. 111-148 (Mar. 23, 2010) 124 Stat. 119), subsection (h) was added to the federal antikickback statute: "With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section." (42 U.S.C. § 1320a-7b(h).)

### 2. *California Antikickback Statutes*

Notably, California's principal Medi-Cal antikickback statute, Welfare and Institutions Code section 14107.2,[8] is not at issue in this case. That statute criminalizes the offer or payment of "any remuneration, including, but not restricted to, any kickback, bribe, or rebate . . . [¶] . . . [for referring] any individual to a person for the furnishing or arranging for furnishing of any service . . . ." (Welf. & Inst. Code, §14107.2, subd. (b)(1).) But Guiamelon's only conviction was for a violation of section 650, and Welfare and Institutions Code section 14107.2, subdivision (e) expressly provides: "The enforcement remedies provided under this section are not exclusive and shall not preclude the use of any other criminal or civil remedy."

Section 650, which predated the federal law discussed here, makes it unlawful for any physician to offer "any rebate, refund, commission, prefer-ence, patronage dividend, discount, or other consideration, whether in the form of money or otherwise, as compensation or inducement for referring patients, clients, or customers to any person . . . ." (§ 650, subd. (a).) Unlike the federal antikickback statute, there is no language in section 650 requiring that a violation be committed "knowingly" or "willfully." The violation of

---

[8] In pertinent part, Welfare and Institutions Code section 14107.2, subdivision (a) provides: "Any person who solicits or receives any remuneration, including, but not restricted to, any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in valuable consideration of any kind, either: [¶] . . . In return for the referral, or promised referral, of any individual to a person for the furnishing or arranging for the furnishing of any service . . . for which payment may be made, in whole or in part, under this chapter . . . [¶] . . . is punishable upon a first conviction by imprisonment in a county jail for not longer than one year [or state prison], or by a fine not exceeding ten thousand dollars ($10,000), or by both that imprison-ment and fine. A second or subsequent conviction shall be punishable by imprisonment [in the state prison]."

Guiamelon was found not guilty of a violation of Welfare and Institutions Code section 14107.2, subdivision (b)(1), which punishes the payment of "any remuneration, including, but not restricted to, any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in valuable consideration of any kind," to "refer any individual to a person for the furnishing or arranging for furnishing of any service . . . for which payment may be made, in whole or in part, under this chapter or Chapter 8 (commencing with Section 14200). . . ." "For purposes of this section, 'kickback' means a rebate or anything of value or advantage, present or prospective, or any promise or undertaking to give any rebate or thing of value or advantage, *with a corrupt intent to unlawfully influence the person to whom it is given* in actions undertaken by that person in his or her public, professional, or official capacity." (Welf. & Inst. Code, § 14107.2, subd. (d), italics added.)

section 650 is a general intent crime, requiring proof only that the defendant offered consideration as inducement for referrals; no specific intent is required. (*People v. Hering* (1999) 20 Cal.4th 440, 447 [84 Cal.Rptr.2d 839, 976 P.2d 210] (*Hering*).) Section 650 "was enacted (1) to ensure that referrals would not be induced by considerations other than the best interest of the patient (63 Ops.Cal.Atty. Gen. 89, 92 (1980)) and (2) to prevent patients being charged more for treatment because of an additional hidden fee imposed to recoup payment for securing the referral (53 Ops.Cal.Atty.Gen. 117, 118 (1970); 16 Ops.Cal.Atty.Gen. 18, 20–21 (1950))." (65 Ops.Cal.Atty.Gen. 252 (1982).) We turn to Guiamelon's argument that section 650 is preempted by the federal antikickback statute.

II

■ Guiamelon argues that section 650 is preempted by the federal antikickback statute because the higher scienter requirement under the federal statute conflicts with section 650, or, as applied to her conduct, is an obstacle to the congressional objective of encouraging provision of health care to the underserved. As we explain, our analysis is guided by presumptions against preemption in these circumstances. We agree that the scienter requirement of section 650 is lower than the scienter standard under the federal antikickback statute. At a minimum, federal courts which have addressed the issue agree that a defendant must know his or her conduct is unlawful, an element not required under section 650. But this difference is not dispositive. Conflict preemption is not demonstrated simply because a state statute prohibits what is allowed under a federal statute. We also find no obstacle preemption. Our examination of the Social Security Act, of which the antikickback statute is a part, reveals that Congress consistently has expressed dual purposes: to further the provision of health care to the needy as Guiamelon asserts, but also to prevent and punish fraud and kickbacks in the provision of those services. Since section 650 is consistent with this latter purpose, we conclude it is not an obstacle to accomplishment of the congressional purpose, and that there is no preemption.

A. *Preemption Principles*

■ The supremacy clause of the United States Constitution vests Congress with the power to preempt state law. (*Brown v. Mortensen* (2011) 51 Cal.4th 1052, 1059 [126 Cal.Rptr.3d 428, 253 P.3d 522] (*Brown*).) "There are four species of federal preemption: express, conflict, obstacle, and field. (See *Bronco Wine Co. v. Jolly* (2004) 33 Cal.4th 943, 955 [17 Cal.Rptr.3d 180, 95 P.3d 422].)" (*Viva!, Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 935 [63 Cal.Rptr.3d 50, 162 P.3d 569] (*Viva!*).) These categories " 'are not "rigidly distinct." ' " (*Crosby v. National*

*Foreign Trade Council* (2000) 530 U.S. 363, 372, fn. 6 [147 L.Ed.2d 352, 120 S.Ct. 2288]; [citation].)" (*Viva!*, at p. 935, fn. 3.) Both the California Supreme Court and the United States Supreme Court "have often identified only three species of preemption, grouping conflict preemption and obstacle preemption together in a single category. [Citations.]" (*Id.* at pp. 935–936, fn. 3.) Since there is no explicit language in the federal antikickback statute demonstrating a congressional intent to preempt state antikickback statutes (see *Viva!*, at p. 936), Guiamelon claims only conflict and obstacle preemption. "[C]onflict preemption will be found when simultaneous compliance with both state and federal directives is impossible. [Citations.] . . . [O]bstacle preemption arises when ' "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ' [Citations.]" (*Ibid.*)

■ In *Brown* our Supreme Court described the " 'two cornerstones' " of federal preemption analysis. (*Brown, supra*, 51 Cal.4th at pp. 1059–1060, quoting *Wyeth v. Levine* (2009) 555 U.S. 555, 565 [173 L.Ed.2d 51, 129 S.Ct. 1187] (*Wyeth*).) The first is a question of congressional intent in that " '[t]he purpose of Congress is the ultimate touchstone' in every pre-emption case." (*Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 485 [135 L.Ed.2d 700, 116 S.Ct. 2240] (*Medtronic*); quoted with approval in *Brown, supra*, 51 Cal.4th at pp. 1059–1060.) " 'Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the "statutory framework" surrounding it.' (*Medtronic*, at p. 486, quoting *Gade v. National Solid Wastes Management Assn.* (1992) 505 U.S. 88, 111 [112 L.E2d. 73, 112 S.Ct. 2374].) 'Also relevant, however, is the "structure and purpose of the statute as a whole," [citation] as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law.' (*Medtronic*, at p. 486, [citation].)" (*Olszewski, supra*, 30 Cal.4th at p. 816.)

The other cornerstone is a presumption against preemption: " 'Second, "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' . . . we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " ' [Citations.] The role of the presumption against preemption is to ' "provide[ ] assurance that 'the federal-state balance' [citation] will not be disturbed unintentionally by Congress or unnecessarily by the courts." ' [Citation.]" (*Brown, supra*, 51 Cal.4th at p. 1060.)

■ This presumption applies here, because public health and the costs of medical care are subjects traditionally regulated by the states. (*Olszewski,*

*supra*, 30 Cal.4th at p. 815.) Our Supreme Court explained: "This is true even though California enacted these statutes as part of its implementation of the federal Medicaid program. Contrary to plaintiff's assertion, Medicaid is not a 'field' traditionally legislated by Congress. Rather, by enacting the Medicaid statutes, Congress legislated in the field of public health—a field traditionally regulated by the states. [Citation.] The presumption against preemption therefore applies. [Citation.]" (*Id.* at pp. 815–816.)

*Olszewski* emphasized that the cooperative federal-state nature of the Medicaid program makes the case for federal preemption less persuasive: "Indeed, the very nature of the Medicaid program triggers a presumption against preemption. The Medicaid program is 'based on a scheme of cooperative federalism.' (*King v. Smith* (1968) 392 U.S. 309, 316 [20 L.Ed.2d 1118, 88 S.Ct. 2128].) Under this scheme, a participating state creates and administers its own plan which must be approved by the Secretary. [Citation.] Thus, the participating state works in tandem with the federal government in pursuit of a common purpose—the provision of medical care to the needy. 'Where[, as here,] coordinated state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal pre-emption becomes a less persuasive one.' (*New York Dept. of Social Services v. Dublino* (1973) 413 U.S. 405, 421 [37 L.E2d 688, 93 S.Ct. 2507].)" (*Olszewski, supra*, 30 Cal.4th at p. 816.)

With these principles in mind, we turn to the federal statute at issue. As we have seen, Congress enacted the federal antikickback statute in 1977 to address "the 'disturbing degree [of] fraudulent and abusive practices associated with the provision of health services financed by the medicare and medicaid programs.' See H.R.Rep. No. 95-393, pt. 2, at 44 (1977), reprinted in 1977 U.S.C.C.A.N. 3039, 3047." (*U.S. v. Shaw, supra*, 106 F.Supp.2d at p. 110, italics omitted.) The Ninth Circuit described the purpose of the antikickback statute as "to strengthen the government's ability to prosecute and punish fraud in the system." (*Hanlester, supra*, 51 F.3d at p. 1396.) In the ensuing years, multiple safe harbors have been adopted to exclude various types of conduct from punishment under the federal antikickback statute but Guiamelon does not claim that her conduct falls within any of these.

B. *Conflict Preemption*

In order to establish conflict preemption, Guiamelon must demonstrate that it was impossible for her to comply with both the federal antikickback statute and section 650. (*Wyeth, supra*, 555 U.S. at pp. 571–572.) Her argument is premised on the contention that under the federal law the prosecution must prove a greater level of scienter than is required by section 650.

◼ In *Hering*, the Supreme Court rejected arguments that section 650 required an intention to " 'actually commit the act of paying a rebate' " or " 'to induce the referral' of patients."[9] (*Hering, supra,* 20 Cal.4th at p. 445.) The court found it unnecessary to classify the scienter required as general or specific intent because it held that such classification is necessary only when the court must determine whether a defense of voluntary intoxication or mental disease is available, and there are issues of admissibility and jury instructions related to those defenses. (*Id.* at pp. 446–447.) The Supreme Court concluded: "Without being unavoidably tautological, one could not make an offer as inducement without intending to induce, i.e., the proscribed conduct incorporates the requisite culpable state of mind. [Citation.]" (*Id.* at p. 447.) The court also found "no prejudice in giving the general intent instruction, which states that '[w]hen a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent . . . .' [Citation.] With respect to Business and Professions Code section 650 . . . that which the law declares to be a crime is offering 'any . . . consideration . . . as . . . inducement' for referring patients, i.e., making such an offer for the purpose of inducing referrals." (*Ibid.*)

The *Hering* court noted that the scienter requirement under section 650 does not preclude "the jury from considering a defense that the objective in offering a rebate was lawful. [Citation.] Under the statutory definition of Business and Professions Code section 650, the jury must find the offer was made as inducement for referrals. [Citation.] To do so, it must reject any proffered defense of legitimate purpose." (*Hering, supra,* 20 Cal.4th at p. 447, fn. 4.)

◼ More recently, in *Stark v. Superior Court* (2011) 52 Cal.4th 368 [128 Cal.Rptr.3d 611, 257 P.3d 41], the California Supreme Court examined the scienter requirement for general intent crimes punishing willful acts or omissions. It concluded that a defendant must know "the facts that must be proven to show his act is the kind of conduct proscribed by the statute." (*Id.* at p. 397.) But the court also held the defendant "need not know that his behavior in light of those facts is regulated by a statute. . . . [¶] A defendant does not have to know that his conduct is a crime." (*Ibid.*)[10]

The requisite intent for a violation of the federal antikickback statute, which requires that the defendant act "knowingly and willfully," is more

---

[9] *Hering* also involved a similar statute—Insurance Code section 750. (*Hering, supra,* 20 Cal.4th at p. 445.)

[10] "Willfully" is defined in Penal Code section 7, subdivision 1: "The word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act . . . . *It does not require any intent to violate law,* or to injure another, or to acquire any advantage." (Italics added.) (*People v. Atkins* (2001) 25 Cal.4th 76, 85 [104 Cal.Rptr.2d 738, 18 P.3d 660] [willfully requires " 'only that the illegal act . . . occur

unsettled. Citing *Hanlester, supra,* 51 F.3d at page 1400, Guiamelon asserts that "[c]ourts have interpreted this knowing and willful requirement of the federal anti-kickback statute as requiring the government to prove that a defendant knew that her conduct was prohibited by law but nevertheless acted with an intent to disobey the law." This is an oversimplification of the state of federal jurisprudence on the scienter requirement under the federal antikickback statute.

The federal antikickback cases have taken different approaches to this issue, but generally find it necessary to prove that the defendant knew he or she was acting unlawfully in order to satisfy the willfulness element of the statute. The Ninth Circuit went further, construing the " 'knowingly and willfully' " language "as requiring appellants to (1) know that [the federal anti-kickback statute] prohibits offering or paying remuneration to induce referrals, and (2) engage in prohibited conduct with the specific intent to disobey the law." (*Hanlester, supra,* 51 F.3d at p. 1400.) We have found no circuit court decision that has adopted this heightened standard requiring knowledge of the statute and an intent to disobey it.[11] The Eighth Circuit has held that the government must prove that the defendant knew his or her conduct was wrongful, rather than that it violated a " 'known legal duty.' " (*U.S. v. Jain, supra,* 93 F.3d at pp. 440–441.) The Eleventh Circuit rejected an argument that a conviction requires that the defendant knew his or her referral arrangement violated the federal antikickback statute. (*U.S. v. Starks* (11th Cir. 1998) 157 F.3d 833, 837 [relying on *Bryan v. United States* (1998) 524 U.S. 184, 193 [141 L.Ed. 2d 197, 118 S.Ct. 1939] (*Bryan*), which held that a defendant may be found guilty of violating a statute employing the word "willfully" if defendant "acted with an evil-meaning mind, . . . that he acted with knowledge that his conduct was unlawful"].) The instruction upheld in *U.S. v. Starks* required the jury to find that the defendant committed the illegal act " 'voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or to disregard the law.' " (*U.S. v. Starks, supra,* 157 F.3d at p. 838.)

The First Circuit approved an instruction which required that the " 'defendants . . . have to have been shown to have acted knowingly and willfully.

"intentionally," without regard to motive *or ignorance of the act's prohibited character.'* [Citations.]" (italics added)]; see also *People v. Hagedorn* (2005) 127 Cal.App.4th 734, 744 [25 Cal.Rptr.3d 879].)

Penal Code section 7, subdivision 5 defines "knowingly": "The word 'knowingly' imports only a knowledge that the facts exist which bring the act or omission within the provisions of this code. It does not require any knowledge of the unlawfulness of such act or omission."

[11] In *U.S. v. McClatchey* (10th Cir. 2000) 217 F.3d 823, the parties agreed that the jury was properly instructed that the defendant must have knowingly and willfully joined a conspiracy with the specific intent to violate the federal antikickback act. (217 F.3d at pp. 829, 831.) The Tenth Circuit therefore did not address the split in federal authority concerning the scienter requirement under the statute.

Knowingly simply means to do something voluntarily, to do it deliberately, not to do something by mistake or by accident or even negligently. Willfully means to do something purposely, with the intent to violate the law, to do something purposely that law forbids.' " (*U.S. v. Bay State Ambulance and Hosp. Rental Service, Inc., supra*, 874 F.2d at p. 33.) The Fifth Circuit upheld an instruction that informed the jury that "knowingly 'means that the act was done voluntarily and intentionally, not because of mistake or accident,' and willfully 'means that the act was committed voluntarily and purposely with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law.' [Citation.]" (*U.S. v. Davis* (5th Cir. 1998) 132 F.3d 1092, 1094.)

The federal antikickback cases requiring only that the defendant know his or her conduct was unlawful are consistent with the Supreme Court's interpretation of the terms "willfully" and "knowingly" in *Bryan, supra*, 524 U.S. 184. That case arose in the context of a specific intent federal statute regulating the sale of firearms. Bryan was charged with conspiracy to violate 18 United States Code section 922(a)(1)(A) and a substantive violation by willfully engaging in the business of dealing in firearms.[12] (524 U.S. at pp. 189–190.) On appeal Bryan argued that his knowledge of the federal licensing requirement was an essential element of the offense and that there was insufficient evidence that he had such knowledge.

■ Where a statute makes conduct criminal only if done "willfully" the Supreme Court held that a jury "must find that the defendant acted with an evil-meaning mind, that is to say, that he acted with knowledge that his conduct was unlawful." (*Bryan, supra*, 524 U.S. at p. 193.) But the *Bryan* court refused to require that the defendant have knowledge of the particular law, which would be an exception to the general rule that ignorance of the law is no excuse. (*Id.* at p. 194 [distinguishing *Cheek v. United States* (1991) 498 U.S. 192, 201 [112 L.Ed.2d 617, 111 S.Ct. 604] and *Ratzlaf v. United States* (1994) 510 U.S. 135, 149 [126 L.Ed.2d 615, 114 S.Ct. 655], as involving highly technical statutes that presented the danger of ensnaring individuals engaged in apparently innocent conduct].) It explained that " 'the knowledge requisite to knowing violation of a statute is factual knowledge as distinguished from knowledge of the law.' " (*Bryan*, at p. 193, quoting Justice Jackson's dissent in *Boyce Motor Lines, Inc. v. United States* (1952) 342 U.S. 337, 345 [96 L.Ed. 367, 72 S.Ct. 329].)

This jurisprudence suggests that at a minimum, a defendant must act with knowledge that his or her conduct is unlawful to be punished under the

---

[12] The statute at issue, 18 United States Code section 922(a)(1)(A), makes it unlawful for any person except a licensed importer, manufacturer or dealer to import, manufacture or deal in firearms. Title 18 United States Code section 924 specifies the punishment for various knowing or willful violations of the firearms statutes.

federal antikickback statute, while under section 650 the defendant need not know his or her conduct is unlawful. But this does not end the conflict preemption analysis. As we have seen, Guiamelon must show that simultaneous compliance with both the state and federal statutes is impossible. (*Viva!, supra,* 41 Cal.4th at p. 936.)[13]

■ In determining whether we may infer a congressional intent to preempt state law, we may rely on a federal agency's interpretation of the relevant statute: " 'In general, an agency's interpretation of statutes within its administrative jurisdiction is given presumptive value as a consequence of the agency's special familiarity and presumed expertise with . . . legal and regulatory issues. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11 [78 Cal.Rptr.2d 1, 960 P.2d 1031] . . . .)' [Citation.]" (*Cellphone Termination Fee Cases* (2011) 193 Cal.App.4th 298, 312, fn. 13 [122 Cal.Rptr.3d 726]; see *Cotton v. StarCare Medical Group, Inc.* (2010) 183 Cal.App.4th 437, 453 [107 Cal.Rptr.3d 767].)

Here, the Office of the Inspector General of the Department of Health and Human Services (OIG), which is authorized to promulgate the "safe harbor" provisions applicable to the antikickback statute, has concluded that the federal statute is not intended to preempt state antikickback laws. In 1987, the OIG published a notice of intent to draft regulations developing the safe harbor exceptions to the antikickback statute. In response, the OIG received comments. (U.S. Dept. of Health & Human Services, Off. of Inspector Gen., rules and regulations, 42 C.F.R. part 1001 (2011), 56 Fed.Reg. 35957 (July 29, 1991).) The OIG noted that "[t]wo commenters requested that the OIG clarify the relationship between the [federal anti-kickback] statute and various State laws." The OIG responded: "Issues of state law are *completely independent* of the federal anti-kickback statute and these regulations. *There*

---

[13] We have found only one decision addressing the similar question of whether the California antikickback statute conflicts with the federal antikickback statute because of the difference in the scienter requirement. (*In re Pharmaceutical Industry Average Wholesale Price Litigation* (D.Mass. 2007) 478 F.Supp.2d 164.) The case arose in a very different procedural posture, involving motions to dismiss the case under Federal Rule of Civil Procedure, rules 9(b) and 12(b)(6) (28 U.S.C.). The district court considered both conflict and obstacle preemption. (478 F.Supp.2d at p. 178.) The court acknowledged that the federal antikickback statute requires that conduct be "knowing and willful." (478 F.Supp.2d at p. 179.) But the scienter requirement under the California antikickback statute differs depending on the type of remuneration paid, in that a kickback requires *"corrupt intent"* but other kinds of remuneration do not require specific intent. (478 F.Supp.2d at p. 179, italics added.) Since the complaint alleged actual kickbacks, the court concluded that no severe conflict existed between the federal and state scienter requirements and found no preemption. It noted that when the plaintiff specified the specific theory of remuneration as to each defendant after discovery, the issue could be revisited. (*Id.* at pp. 179–180.) Section 650 does not have any provision requiring a corrupt intent as does the California antikickback statute at issue in *In re Pharmaceutical Industry Average Wholesale Price Litigation.*

*is no federal preemption provision under the statute. Thus, conduct that is lawful under the federal anti-kickback statute or this regulation may still be illegal under State law.* Conversely, conduct that is lawful under State law may still be illegal under the federal anti-kickback statute." (*Ibid.*, italics added.)

This is a strong indication that the federal antikickback statute was intended to supplement, rather than supplant, state antikickback statutes, such as section 650. The evolution of the federal antikickback statute demonstrates a congressional intent to safeguard Medicare and Medicaid funds by eliminating improper practices such as the payment of remuneration for patient referrals. We note that section 650 originally was enacted in 1949, and that the provision at issue here remains essentially unchanged. Thus, it was in effect at the time the OIG opined that there was no federal preemption.

In *Hypertouch, Inc. v. ValueClick, Inc.* (2011) 192 Cal.App.4th 805 [123 Cal.Rptr.3d 8] (*Hypertouch*), the issue was whether the federal Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 (CAN-SPAM Act; 15 U.S.C. § 7701 et seq.) preempted Business and Professions Code section 17529.5, which prohibits entities from advertising in an e-mail that contains various types of deceptive content. A savings clause in the express preemption clause of the CAN-SPAM Act permitted states to prohibit " ' "falsity or deception in any portion of a commercial electronic mail message." ' [Citation.]" (192 Cal.App.4th at p. 826.) The preemption issue turned on whether Congress intended to limit the savings clause to state statutes that require the plaintiff to establish every element of common law fraud. (192 Cal.App.4th at p. 825.) Based on the presumption that Congress was aware of the many state statutes prohibiting commercial e-mails without requiring all the elements of common law fraud in effect when the CAN-SPAM Act was enacted, the *Hypertouch* court concluded that Congress did not intend to preempt the state statutes, including California's. (192 Cal.App.4th at p. 828.) Similarly, section 650 was enacted long before the federal antikickback statute. As in *Hypertouch*, we presume Congress was aware of the California state statute, and similar laws in other states that prohibit the payment of consideration for patient referrals. This supports our conclusion that no implied preemption was intended.

In *Wyeth*, a drug manufacturer invoked conflict preemption, arguing that a state-law duty to provide stronger warnings about drug administration would obstruct the purposes and objectives of federal drug labeling regulations. The Supreme Court rejected the argument, finding that it was based in part on an untenable interpretation of congressional intent. (*Wyeth, supra*, 555 U.S. at p. 573.) The court cited evidence that Congress's purpose in enacting the applicable federal law, the Federal Food, Drug, and Cosmetic Act (FDCA;

21 U.S.C. § 301 et seq.), was to bolster consumer protection against harmful products, and concluded that Congress's failure to provide a federal remedy for consumers evidenced a determination that widely available state rights of action provided appropriate relief. (555 U.S. at p. 574.) The *Wyeth* court observed: "If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history." (*Ibid.*) No express preemption clause was enacted by Congress. (*Ibid.*) The court concluded: "[Congress's] silence on the issue, coupled with its certain awareness of the prevalence of state tort litigation, is powerful evidence that Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness. As Justice O'Connor explained in her opinion for a unanimous Court: 'The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them.' [Citations.]" (*Id.* at p. 575.)

A similar situation is presented here. As discussed, Medicaid is an example of cooperative federalism under which states are allowed flexibility in developing procedures for administering their statutory obligations under Medicaid and their state plans. (*Olszewski, supra,* 30 Cal.4th at p. 810.) Congressional awareness of state antikickback laws is demonstrated in the position of the OIG that the federal antikickback statute does not preempt state law, and that "conduct that is lawful under the federal antikickback statute or this regulation may still be illegal under State law." (U.S. Dept. of Health & Human Services, Off. of Inspector Gen., rules and regulations, 42 C.F.R. part 1001 (2011), 56 Fed.Reg. 35952-01.) Congress repeatedly has expressed its intent to prohibit practices condemned by the antikickback statute, but has not enacted a preemption clause making it the only remedy. As in *Wyeth, supra,* 555 U.S. 555, the case for preemption is particularly weak in light of these circumstances.

■ A claim of conflict preemption was rejected in *Qualified Patients Assn. v. City of Anaheim* (2010) 187 Cal.App.4th 734 [115 Cal.Rptr.3d 89], which addressed whether California law decriminalizing some uses of marijuana for medical purposes was preempted by the federal Controlled Substances Act (21 U.S.C. §§ 812, 844(a)). Since the California law did not *require* conduct which would violate federal law, the court concluded there was no " 'positive conflict' " with federal law. (*Qualified Patients Assn. v. City of Anaheim, supra,* 187 Cal.App.4th at p. 759.) It held: "In short, nothing in either state enactment purports to make it impossible to comply simultaneously with both federal and state law." (*Ibid.*) Guiamelon could have complied with both section 650 and the federal antikickback statute by avoiding

payments for patient referrals. We conclude that there is no conflict between section 650 and the federal antikickback statute resulting in preemption of the state statute.

## C. *Obstacle Preemption*

██ Guaimelon argues that section 650 as applied to her is an obstacle to Congress's intent to encourage the provision of health care services to the needy, expressed in the definition of remuneration in 42 United States Code section 1320a-7a(i)(6)(F). That statute sets out civil penalties for various improper practices under the Social Security Act, including the commission of an act in violation of the antikickback statute. (42 U.S.C. § 1320a-7a(a)(7).) Subsection (i)(6) defines "remuneration" for purposes of section 1320a-7a to include "(F) any other remuneration which promotes access to care and poses a low risk of harm to patients and *Federal health care programs* (as defined in section 1320a-7b(f) of this title and designated by the Secretary under regulations) . . . ." (Italics added.)

It is telling that Guiamelon omitted the italicized portion of this definition that requires that the remuneration poses a low risk of harm to federal health care programs. The legislative history of the antikickback statute demonstrates a continuing congressional concern that kickbacks for patient referrals would harm the health care programs. "Indeed, Congress requires states, as part of the federalist Medicaid and Medicare programs, to actively combat fraud. *See, e.g.,* Deficit Reduction Omnibus Reconciliation Act of 2005, Pub.L. No. 109-171, § 6023 (2005) (encouraging the enactment of state false claims acts to combat Medicare fraud)." (*In re Pharmaceutical Industry Average Wholesale Price Litigation, supra,* 478 F.Supp.2d at p. 178.) The language of the federal statutes demonstrates that Congress had dual purposes in mind: both the promotion of access to care and the prevention of improper practices within that scheme, including payments made for patient referrals as set out in the antikickback statute. The definition of remuneration relied upon by Guiamelon does not conflict with the antikickback statute or section 650 and therefore section 650 does not pose an obstacle.

In *Viva!*, appellants argued that a California statute prohibiting the importation into or sale within California of products made from kangaroo (Pen. Code, § 653*o*) was preempted by federal policies intended to influence Australian kangaroo management practices. (*Viva!, supra,* 41 Cal.4th at p. 934.) Their argument was that state law could not prohibit what federal law authorized. The Supreme Court found no obstacle preemption, citing *Bronco Wine Co. v. Jolly, supra,* 33 Cal.4th 943, another case in which a party argued that a state statute was preempted because it prohibited what federal law authorized. (*Id.* at p. 992.) "As we explained in rejecting this argument,

‘ "[t]here is a difference between (1) not making an activity unlawful, and (2) making that activity lawful." In our view it is more accurate to characterize the state statute as prohibiting . . . what the federal [regulation] *does not prohibit*.' [Citations.] So too here: federal law does not prohibit importation of kangaroo products, while state law does. That arrangement poses no obstacle to current federal policy." (*Viva!, supra,* at p. 952, quoting *Bronco Wine, supra,* at p. 992.)

Based on these principles, we find no obstacle preemption in this case. Section 650 prohibits the payment of consideration in exchange for referrals of patients, and does not require that the defendant knew such payment would violate the law. Some courts have interpreted the federal antikickback statute to require that the defendant act with knowledge that his or her conduct was unlawful (e.g., *U.S. v. Jain, supra,* 93 F.3d at pp. 440–441; *U.S. v. Starks, supra,* 157 F.3d at p. 838). According to Guiamelon, section 650 is preempted because it punishes negligent and inadvertent conduct which is allowed by the federal antikickback statute. But under *Viva!* and *Bronco Wine,* the fact that a state statute punishes conduct not prohibited by federal law is not a basis for obstacle preemption. Rather, the purpose of section 650 is consistent with the federal antikickback statute—to prohibit and punish payment for referrals to medical providers.[14]

Guiamelon has failed to demonstrate a " 'clear and manifest' " congressional intent to preempt state law regarding the payment of consideration for patient referrals. (*Bronco Wine Co. v. Jolly, supra,* 33 Cal.4th at p. 957.) No basis for preemption has been established.

### III

The theme of Guiamelon's next argument is that she believed her conduct was lawful and that her payments to the marketers furthered federal and state public policy by making preventative health care services available to uninsured patients who otherwise would not have received care. She urges: "To preserve the constitutionality of Section 650, the statute must be interpreted under the unique circumstances of this case as not prohibiting payments made to marketers for services which further the enrollment of

---

[14] We are aware that the Florida Supreme Court reached the opposite result in ruling that a Florida Medicaid antikickback statute was preempted by the federal antikickback statute, a case cited by Guiamelon. (*Florida v. Harden* (Fla. 2006) 938 So.2d 480 (*Harden*).) We agree with respondent that *Harden* is distinguishable. The Florida Medicaid antikickback statute criminalized negligent conduct by finding a violation committed by a " 'person who is aware or *should be aware* of the nature of his or her conduct and that his or her conduct is substantially certain to cause the intended result.' " (938 So.2d at p. 491.) As we have seen, California does not punish negligent behavior under section 650. In addition, the *Harden* court's ruling was based in large part on application of a regulatory safe harbor provision not applicable here. (938 So.2d at pp. 492–493.)

uninsured payments [(patients)] in the two programs at issue." She claims dire consequences as a result of her conviction, including an indefinite suspension from all federal and state health care programs. She also cites the federal and state public policy to encourage the provision of health care to the needy.

■■■ Guiamelon repeatedly invokes her testimony that she acted with a good faith belief that her payments were legal and were furthering the public policy of providing preventative health services to the underserved. She argues that we must interpret section 650 to exclude from the scope of the statute defendants who acted in a good faith but mistaken belief in the lawfulness of their conduct. There are two problems with this argument. First, as the court in *People v. Duz-Mor Diagnostic Laboratory, Inc.* (1998) 68 Cal.App.4th 654 [80 Cal.Rptr.2d 419] (*Duz-Mor*), held, "we do not read into statutes provisions not placed in them by the Legislature. (Code Civ. Proc., § 1858.)" (*Id.* at p. 669 [refusing to interpret Welf. & Inst. Code, § 14107.2, the Cal. Medicaid antikickback statute, to require specific intent where not expressly required by statute].) Second, the jury was instructed on a mistake of fact defense pursuant to *Hering*: "If you find that the defendant believed that she was paying for lawful marketing services she did not have the specific intent or mental state required for crimes in [counts] III [(Welf. & Inst. Code, § 14107.2, subd. (b))] and IV [(§ 650)]."[15] The jury rejected this defense as to the violation of section 650 by convicting Guiamelon on this charge.

Guiamelon cites the trial court's instruction on mistake of law, which read: "It is not a defense to the crime[s] of III & IV <insert crime[s]> that the defendant did not know she was breaking the law or that she believed her act was lawful." (CALCRIM No. 3407, as modified.) But she does not argue the court erred in giving these instructions. Since the jury found no good faith defense, we have no basis to interpret the statute as Guiamelon suggests to reverse her conviction because she acted in good faith.

■■■ We are asked to apply the "rule of lenity." " ' "It is the policy of this state to construe a penal statute as favorably to the defendant as its language

---

[15] The full instruction read: "The defendant is not guilty of ___ if (he/she) did not have the intent or mental state required to commit the crime because she did not know a fact or reasonably and mistakenly believed a fact. [¶] If the defendant's conduct would have been lawful under the facts as she believed them to be, she did not commit crimes in counts III & IV. [¶] If you find that the defendant believed that she was paying for lawful marketing services she did not have the specific intent or mental state required for crimes in III & IV. [¶] If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for crimes in III & IV, you must find her not guilty of those crimes."

and the circumstances of its application may reasonably permit; [because,] just as in the case of a question of fact, the defendant is entitled to the benefit of every reasonable doubt as to the true interpretation of words or the construction of language used in a statute." ' [Citations.]" (*Bradwell v. Superior Court* (2007) 156 Cal.App.4th 265, 270 [67 Cal.Rptr.3d 163] [applying rule of lenity to interpretation of *ambiguous* penal statutes]; *People v. Ramirez* (2010) 184 Cal.App.4th 1233, 1239 [109 Cal.Rptr.3d 474] [where penal statute is subject to two interpretations, that favorable to the accused must be adopted].)

But the rule is limited. In *People v. Avery* (2002) 27 Cal.4th 49 [115 Cal.Rptr.2d 403, 38 P.3d 1], the court discussed the limitation: " 'The rule [of lenity] applies only if the court can do no more than guess what the legislative body intended; there must be an egregious ambiguity and uncertainty to justify invoking the rule.' [Citation.] In *People v. Jones* (1988) 46 Cal.3d 585, 599 [250 Cal.Rptr. 635, 758 P.2d 1165], we described the rule of lenity in a way fully consistent with [Penal Code] section 4: 'The rule of statutory interpretation that ambiguous penal statutes are construed in favor of defendants is inapplicable unless two reasonable interpretations of the same provision stand in relative equipoise, i.e., that resolution of the statute's ambiguities in a convincing manner is impracticable.' " (*People v. Avery, supra,* at p. 58.) The court warned: "[A]lthough true ambiguities are resolved in a defendant's favor, an appellate court should not strain to interpret a penal statute in defendant's favor if it can fairly discern a contrary legislative intent." (*Ibid.*)

██ There is no ambiguity in the plain meaning of section 650 as interpreted by the Supreme Court in *Hering*. The Legislature has enacted an exception to section 650, but expressly made it inapplicable to the payment of consideration for referral of patients. (§ 650, subd. (b).)[16] No exception for good faith referral payments has been recognized by the Legislature. In the absence of an ambiguity in section 650, the rule of lenity does not apply.

██ Guiamelon also challenges section 650 as unconstitutionally vague as applied. " 'The constitutional interest implicated in questions of statutory vagueness is that no person be deprived of "life, liberty, or property without

---

[16] Section 650, subdivision (b) provides: "The payment or receipt of consideration for services *other than the referral of patients* which is based on a percentage of gross revenue or similar type of contractual arrangement shall not be unlawful if the consideration is commensurate with the value of the services furnished or with the fair rental value of any premises or equipment leased or provided by the recipient to the payer." (Italics added.)

due process of law," as assured by both the federal Constitution [citation] and the California Constitution [citation]. Under both Constitutions, due process of law in this context requires two elements: a criminal statute must " 'be definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt.' " [Citations.]' " (*People v. Hagedorn, supra*, 127 Cal.App.4th at p. 745.) We begin with " ' "the strong presumption that legislative enactments 'must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. [Citations.]' " ' " (*Ibid.*) " ' " ' A statute should be sufficiently certain so that a person may know what is prohibited thereby and what may be done without violating its provisions, but it cannot be held void for uncertainty if any reasonable and practical construction can be given to its language.' " [Citation.]' [Citation.]" (*Ibid.*, quoting *Williams v. Garcetti* (1993) 5 Cal.4th 561, 567–568 [20 Cal.Rptr.2d 341, 853 P.2d 507].)

■ Guiamelon argues that section 650 fails to place a reasonable person on notice of the distinction between various types of marketing services, some of which are lawful and others unlawful. In support of that argument, she cites other exceptions expressly set out in section 650. These exceptions relate to (1) the offer, delivery, receipt, or acceptance of any consideration between a federally qualified health center and an individual or entity providing goods, services, donations, or loans; (2) the referral by a licensed health care practitioner of a person to any laboratory, pharmacy, clinic or health care facility "solely" because the licensee has a propriety interest or ownership in that facility (with limitations on the return on investment) so long as there was a valid medical need for the referral; and (3) nonmonetary remuneration in the form of hardware, software, or information technology and training services. (§ 650, subds. (c)–(e).) None of these exceptions covers the situation presented here—a physician's payment of consideration to an individual in return for the referral of a patient. Nothing in these exceptions renders vague the prohibition on referral fees codified in section 650, subdivision (b). Section 650 plainly prohibits a physician from paying consideration for the referral of patients. This language " 'sufficiently warns of the proscribed conduct when measured by common understanding and experience . . . .' " (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 543 [59 Cal.Rptr.3d 876], quoting *People v. Ellison* (1998) 68 Cal.App.4th 203, 208 [80 Cal.Rptr.2d 120].) Therefore, the statute is not unconstitutionally vague.

Guiamelon's argument that section 650 is unconstitutionally vague also is based on her complaint that the term "capping," which was used at trial by the prosecution and a witness, is not defined in the statute. As we have concluded, section 650 clearly states that the behavior in which Guiamelon engaged was unlawful, whatever colloquial term may be used to describe it. In addition, Guiamelon claims that she should not be held criminally liable because she did not pay the marketers for all patients, but only for patients

who could be and were enrolled in the CHDP and Family PACT programs. In a feat approaching semantic legerdemain, Guiamelon asserts that she therefore was not paying for "referrals" within the meaning of section 650 because she did not pay for those patients brought to her by the marketers who could not be enrolled in the federal and state health care programs. We find no support for this construction in the plain language of the statute, the legislative history, or the jurisprudence interpreting it and reject the argument on that basis.

Guiamelon argues the facts of her case are "not materially different" from the payments by a laboratory to a marketer in *Duz-Mor, supra*, 68 Cal.App.4th 654. We disagree. *Duz-Mor* decided the section 650 issue on the basis of a statutory exception not applicable here for " 'payment or receipt of consideration *for services other than the referral of patients* which is based on a percentage of gross revenue or similar type of contractual arrangement . . . if the consideration is commensurate with the value of the services furnished . . . .' " (*Duz-Mor*, at p. 667, italics added.) Guiamelon ignores the Legislature's express choice to exclude the type of conduct in which she engaged from the exception on which *Duz-Mor* was based. This argument conflicts with the " 'settled axiom of statutory construction that significance should be attributed to every word and phrase of a statute, and a construction making some words surplusage should be avoided.' " (*People v. Williams* (2011) 199 Cal.App.4th 1285, 1288–1289 [132 Cal.Rptr.3d 241], quoting *People v. Woodhead* (1987) 43 Cal.3d 1002, 1010 [239 Cal.Rptr. 656, 741 P.2d 154].)

In addition, Guiamelon urges a construction of section 650 based on the fact that the California antikickback statute (Welf. & Inst. Code, § 14107.2) is not incorporated into the Family PACT statutory scheme (Welf. & Inst. Code, § 14132, subd. (aa)(4)). Section 14132 sets out the schedule of benefits available under chapter 7 of part 3 of division 9 of that code on basic health care. (Welf. & Inst. Code, § 14000 et seq.) Subdivision (aa) of section 14132 creates the Family PACT program and paragraph (4) adopts enumerated sections of the Welfare and Institutions Code into the program, and states: "No other provision of law under the Medi-Cal program or the State-Only Family Planning Program shall apply to the program provided for under this subdivision." Guiamelon contends that this language "reflects an obvious legislative intent that the Medi-Cal anti-kickback statute not be applicable to the Family PACT program. It is reasonable to assume this same legislative intent is applicable to Business [and] Professions Code [section] 650."

We do not find this assumption reasonable. The argument is based on terms of the California Medi-Cal program, which is not before us because Guiamelon was acquitted of violating Welfare and Institutions Code section

14107.2. As discussed, section 650 predated both the California and federal antikickback statutes, but the Legislature has not chosen to amend the terms of section 650 to exclude referral payments under any federal or state health care program from the scope of that statute. Instead, the Legislature did the opposite, expressly providing that the California antikickback statute is not an exclusive remedy. (Welf. & Inst. Code, § 14107.2, subd. (e).) Guiamelon is asking us to rewrite section 650, a task left to the Legislature. (See *Duz-Mor, supra*, 68 Cal.App.4th at p. 669.)

We conclude that section 650 is sufficiently certain as to place a licensed medical provider on notice that paying a person for referring patients is illegal.

## IV

In a supplemental letter brief, Guiamelon argues that, as applied, section 650 violates her First Amendment right of freedom of speech, citing *Sorrell v. IMS Health Inc.* (2011) 564 U.S. ___ [180 L.Ed.2d 544, 131 S.Ct. 2653] (*Sorrell*). Her contention is that section 650 is unconstitutionally broad in extending to conduct beyond that which the statute was designed to reach. *Sorrell* invalidated a Vermont statute restricting the sale, disclosure, and use of pharmacy records that reveal prescribing practices of individual physicians. The Supreme Court held that speech in aid of pharmaceutical marketing is a form of expression protected by the free speech clause of the First Amendment. (564 U.S. at p. ___ [131 S.Ct. at p. 2659].) The court held that the Vermont law on its face enacted content and speaker-based restrictions on the sale, disclosure, and use of prescriber-identifying information, thus disfavoring marketing, "that is, speech with a particular content." (*Id.* at p. ___ [131 S.Ct. at p. 2663].) "The First Amendment requires heightened scrutiny whenever the government creates 'a regulation of speech because of disagreement with the message it conveys.' [Citations.]" (*Id.* at p. ___ [131 S.Ct. at p. 2664].)

The *Sorrell* court acknowledged the distinction between restrictions on protected expression and restrictions on economic activity, or on nonexpressive conduct. (*Sorrell, supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2664].) Section 650 falls into the latter category. It penalizes only the *conduct* of paying consideration for referring patients. No restriction on the content of marketing is included. "Criminal laws penalize conduct. If the conduct is permissibly prohibited under the state and federal Constitutions, the fact that the conduct may peripherally involve speech or association does not cloak it with constitutional protections that invalidate the criminal statute prohibiting the conduct." (*People v. Pulliam* (1998) 62 Cal.App.4th 1430, 1439 [73 Cal.Rptr.2d 371] [loitering to commit prostitution is not a form of expression

protected by the 1st Amend.]; *People v. Ellison, supra,* 68 Cal.App.4th 203, 210 [applying reasoning of *Pulliam* to statute prohibiting loitering with intent to commit certain drug offenses].)

By letter brief, Guiamelon cites *U.S. v. Perelman* (9th Cir. 2011) 658 F.3d 1134 (*Perelman*) and *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach* (9th Cir. 2011) 657 F.3d 936 (*Comite de Jornaleros*). *Perelman* was a prosecution under a federal statute (18 U.S.C. § 704(a)) which prohibits unauthorized wearing of military medals. The defendant did not argue that his conduct deserved First Amendment protection. Instead, he brought a facial First Amendment challenge on the ground the statute was overbroad. (*Perelman,* at p. 1136.) Defendant posited a series of circumstances in which the innocent wearing of a medal would raise serious constitutional concern, e.g., actors in films, grieving spouses or family members, or Halloween costumes. (*Id.* at pp. 1136–1137.) The Ninth Circuit concluded that Congress intended to criminalize the unauthorized wearing of military medals only where the wearer intends to deceive and so limited the statute. (*Id.* at pp. 1137–1138.) It also rejected defendant's facial First Amendment challenge, finding the statute standing alone valid on its face. (*Perelman,* at p. 1139.) In addition, it found a compelling governmental interest in preventing the intentionally deceptive wearing of medals. (*Id.* at pp. 1139–1140.) The Ninth Circuit concluded that the governmental interest was unrelated to suppression of free expression "because . . . [the statute] does not prevent the expression of any particular message or viewpoint." (*Id.* at p. 1140.) We do not see how Guiamelon is aided by *Perelman.* Instead, we find it helpful to respondent because it upholds a statute against a First Amendment challenge where the statute does not prevent expression of any particular message or viewpoint, like section 650.

*Comite de Jornaleros, supra,* 657 F.3d 936, involved a First Amendment challenge by organizations representing the interests of day laborers to a city ordinance prohibiting the solicitation of business, employment and contribution on public streets and highways. The Ninth Circuit concluded that the ordinance, while content neutral, was not sufficiently narrowly tailored because it regulated more speech than necessary to achieve the city's purpose. (657 F.3d at pp. 940–941.) The decision recognizes that solicitation constitutes protected expression under the First Amendment. (657 F.3d at p. 945.) We infer that this is the reason Guiamelon cites the case to us. But as we have discussed, section 650 does not regulate any activity protected by the First Amendment, including solicitation. Instead, it regulates the conduct of paying for patient referrals. We reject Guiamelon's First Amendment challenge.

## DISPOSITION

The judgment is affirmed.

Willhite, J., and Manella, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 25, 2012, S202753.